**DREAM PALACE, an Arizona limited liability company, dba Liberty Entertainment Group, LLC; Edmund Archuleta, Jr.; William Alkire; April Cope; Henry Jenkins; Eugene Williams; Cari Elmore; Jennifer McGrath; Susan Roberts; Rachel Russo; Haley Wheeler; Corina Reville; Jill Amante, Plaintiffs–Appellants,**

v.

**COUNTY OF MARICOPA, a political subdivision of the State of Arizona, Defendant–Appellee.**

No. 00–16531.

United States Court of Appeals, Ninth Circuit.

Argued Feb. 11, 2003.

Submitted and Filed Sept. 27, 2004.

G. Randall Garrou, Weston, Garrou & DeWitt, Los Angeles, CA, argued the cause and filed briefs for appellant Dream Palace, et al. John H. Weston was on the briefs.

Scott E. Boehm, Copple, Chamberlin, Boehm & Murphy, P.C., Phoenix, AZ, argued the cause and filed briefs for appellee Maricopa County. Terry E. Eckhart, Office of Maricopa County Attorney, was on the briefs.

Before: CANBY, O'SCANNLAIN, and W. FLETCHER, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Concurrence by Judge CANBY.

O'SCANNLAIN, Circuit Judge.

We must decide whether a local ordinance imposing certain licensing requirements and operating restrictions on adult entertainment establishments violates the First Amendment.

I

A

In 1996, the Arizona legislature amended § 11–821 of the Arizona Revised Statutes, to authorize counties to enact zoning ordinances with respect to adult entertainment establishments. *See* Ariz.Rev.Stat. § 11–821. Acting on its new authority, the Maricopa County Board of Supervisors asked its Planning and Development Department to research and to prepare a draft of what would eventually become Ordinance P–10, at issue in this case.

At the behest of the county board, the planning department prepared a four-page report for board members, addressing the negative effects associated with adult-oriented businesses. In addition to discussing the Supreme Court's decisions in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), the report cited seventeen studies documenting the negative secondary effects associated with adult-oriented establishments. Summarizing the findings of these studies, the report concluded that adult-oriented businesses were associated with "unlawful and unhealthy activities" and generally lead to illicit sexual behavior, crime, unsanitary conditions, and the spread of sexually-transmitted diseases if not properly regulated. Board members were provided with copies of studies from Phoenix and Los Angeles documenting such negative secondary effects, as well as a fourteen-page summary of eleven other studies.

Public hearings were held with respect to the proposed ordinance on April 23, 1997. Two people spoke against the ordinance at those hearings, a local bookstore owner and John Weston, the attorney for the plaintiffs in this case. Others spoke in favor, including state senator David Peterson and state representatives Marilyn Jarrett and Karen Johnson. Most of the testimony pro and con focused on the legality of the proposed ordinance and the need for regulation in light of the perceived secondary effects associated with adult-oriented businesses. The county planning director, Ms. Herberg–Kusy, also addressed the board at these hearings, urging that the studies provided the necessary empirical data to conclude that adult-oriented businesses have a negative secondary impact on surrounding communities. The board voted unanimously to adopt the ordinance, and it became effective on May 27, 1997.

B

Ordinance P–10 is a comprehensive scheme for the licensing and regulation of businesses which come within its purview: that is, adult entertainment businesses. *See* Ordinance § 2.[1] Businesses, managers and employees that come within the ordinance's sweep are each required to obtain a license or permit prior to operating, or working at, an adult entertainment business. Certain procedural safeguards, at issue in this case, are in place with respect to the county's handling of applications for

---

1. Adult-oriented business means "adult arcades, adult bookstores or adult video stores, cabarets, adult live entertainment establishments, adult motion picture theaters, adult theaters, [and] massage establishments that offer adult service or nude model studios." Ordinance § 2. Each of these terms are in turn defined under the ordinance.

licenses and permits. In addition, the ordinance contains numerous operating restrictions on adult-oriented businesses, certain of which are also at issue in this litigation.

The plaintiffs in this action are Dream Palace, a live adult nude dancing establishment in Maricopa County, and certain of its managers and employees (collectively "Dream Palace").[2] When Ordinance P–10 became effective, Dream Palace and its managers and employees did not apply for a business license or for work permits, as required by the ordinance. Instead, on November 13, 1997, they filed suit in federal district court challenging the ordinance on First Amendment grounds, as well as certain state law grounds.

In 1998, apparently at the instigation of Maricopa County, the Arizona legislature enacted Arizona Revised Statute § 11–821(B). Section 11–821(B) expressly provided Arizona counties with the authority to license and to regulate new *or* existing adult-oriented business, and to impose work permit requirements on nude dancers and business managers.[3]

While the state was amending the relevant statute, the county was in the process of amending Ordinance P–10. The proposed amendments were in the nature of minor clarifications; the substance of the ordinance remained unchanged. At a June 17, 1998 board meeting to discuss the amendments, a total of eight further secondary effects studies were made available to board members. On September 2, 1998, the board unanimously voted to approve the amendments. *See* Maricopa County,

Az., Ordinance P–10 (Sept. 2, 1998) (Attached as Appendix to this Opinion).

In the wake of the adopted amendments, Dream Palace filed an amended complaint in district court, renewing Dream Palace's frontal assault on several provisions in the ordinance on First Amendment and state law grounds. Dream Palace simultaneously filed eight separate motions for partial summary judgment. The county filed a single cross-motion for summary judgment on all issues. On September 30, 1999, the district court granted summary judgment in favor of the county on all issues save two. Specifically, with respect to the requirement that an adult entertainment business must obtain a license to operate, the district court held that the procedural safeguards in place were insufficient with respect to pre-existing businesses like Dream Palace, because there was no guarantee that a pre-existing business could continue to operate pending the outcome of an appeals process. The district court also held that the requirement that nude and semi-nude dancers wear identification cards was invalid under *Renton.* The county has not appealed from either of these two rulings. The district court abstained from addressing the state law claims of preemption and ultra vires.

Dream Palace subsequently filed a motion to alter or to amend the judgment, and asked the district court to explain its decision to abstain from addressing the state law claims. The district court denied the motion. In doing so, it explained that it did not address the state law claims because "the various motions for summary

---

**2.** Dream Palace is a "live nude entertainment establishment" within the meaning of the Ordinance. *See* Ordinance § 2.

**3.** In pertinent part, § 11–821(B) provides:
[T]he county plan ... [m]ay provide for the regulation and use of business licenses, adult oriented business manager permits and adult service provider permits in conjunction with the establishment or operation of adult oriented businesses and facilities, including adult arcades, adult bookstores or video stores, cabarets, theaters, massage establishments and nude model studios.

judgment have resolved all of Plaintiffs' federal constitutional claims," and that the "remaining state law claims raise delicate issues involving the interpretation and application of Arizona law." Dream Palace timely appeals.

## II

The Supreme Court has ruled that nude dancing of the type performed at Dream Palace is "expressive conduct" which falls "within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion). Therefore, the ordinance must be analyzed to ensure it does not unduly impair the exercise of First Amendment rights. The specific First Amendment tests that may apply, and the determination as to the proper level of scrutiny, depends for the most part on the nature of the provision that Dream Palace seeks to challenge.

■ Here, Dream Palace challenges several provisions in the ordinance as invalid prior restraints. Those provisions will be upheld only if they provide for a prompt decision during which the status quo is maintained, and there is the opportunity for a prompt judicial decision. *FW/ PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Dream Palace also challenges several of the ordinance's operating restrictions. We assess the constitutionality of those provisions under the "secondary effects" test enunciated by the Supreme Court in *Renton*, 475 U.S. at 47–54, 106 S.Ct. 925.

## III

Dream Palace first challenges the requirement that adult entertainment businesses obtain a license prior to conducting business in Maricopa County.

### A

The district court in this case drew a distinction between pre-existing businesses on the one hand, and new businesses on the other. Specifically, with respect to pre-existing businesses, it found that "there is no guarantee in the ordinance that existing businesses or persons working as managers or adult service providers will be able to continue operating beyond the 180 day period," [4] and for that reason, the licensing scheme was invalid. The district court found, however, that the remaining provisions were valid. Specifically, the district court found that "the County may regulate and license new businesses and does so in this case in as expeditious a manner as possible given administrative realities." The district court held that, with respect to new businesses, the fact that the ordinance "does not provide for a deadline for judicial decisions" did not render the licensing scheme unconstitutional because "the County has no authority to require an absolute time period in which the state court process has to occur."

### B

Before reaching the merits, we must consider the county's argument that Dream Palace, a previously existing business, lacks standing to appeal the district court's decision that the ordinance's licensing requirements can constitutionally be applied to new businesses.

---

**4.** The 180 day period the district court refers to is to be found in section 24, which states that pre-existing businesses "shall be in full compliance with this ordinance, including receipt of any required license or permit, within one hundred eighty days after the effective date" of the ordinance.

### 1

■ The doctrine of standing addresses the question whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). At an "irreducible minimum," Article III of the United States Constitution requires a litigant invoking the authority of a federal court to demonstrate: (1) "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," (2) "that the injury fairly can be traced to the challenged action," and (3) that the injury is "likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal quotation marks and citations omitted).

■ Here, Dream Palace asserts an overbreadth challenge to the business license requirements. Under the overbreadth doctrine, a plaintiff may challenge government action by showing that it may inhibit the First Amendment rights of parties not before the court. *See Young v. City of Simi Valley,* 216 F.3d 807, 815 (9th Cir.2000); *4805 Convoy, Inc. v. City of San Diego,* 183 F.3d 1108, 1111 (9th Cir.1999). The overbreadth doctrine functions as an exception to "the general prohibition on a litigant's raising another person's legal rights," *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), and is based on the idea that "the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). However, the overbreadth doctrine "does not affect the rigid constitutional requirement that plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction." *4805 Convoy, Inc.,* 183 F.3d at 1112 (quoting *Bordell v. General Elec. Co.,* 922 F.2d 1057, 1061 (2d Cir.1991)); *see also Bigelow v. Virginia,* 421 U.S. 809, 816–17, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (to have overbreadth standing, "[t]here must be a claim of specific present objective harm or a threat of specific future harm.") (internal quotation marks omitted). Thus, Dream Palace must still satisfy the injury-in-fact requirement to raise a challenge to the ordinance.

### 2

■ At the outset of these proceedings, we think there is no dispute that Dream Palace had the necessary standing to challenge the overall licensing requirements. By its express terms, the ordinance applied to *both* preexisting businesses and new businesses, and Dream Palace's refusal to apply for the necessary permit therefore placed it in danger of sustaining a direct injury; that is, prosecution for noncompliance with the ordinance. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Only when the district court ruled that the license requirements were invalid with respect to one class of businesses, but valid with respect to another, did a serious question with respect to Dream Palace's standing arise. The issue is therefore more properly characterized as one of mootness on appeal. Dream Palace's challenge to the business license scheme will be moot, and hence not justiciable, if intervening events have caused it completely to lose "its character as a present, live controversy of the kind that must exist if [a court is] to avoid advisory opinions on abstract propositions of law." *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (per curiam); *see also Pap's A.M.,* 529 U.S. at 287, 120 S.Ct. 1382 ("[A] case is moot when the issues presented are no

longer 'live' or the parties lack a legally cognizable interest in the outcome." (modification in original)).

 The issues of mootness and standing are closely related, *see United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), though circumstances that would not support standing as an initial matter may nevertheless be sufficient to defeat a mootness challenge on appeal. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 189–92, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Jacobus v. Alaska,* 338 F.3d 1095, 1103 (9th Cir. 2003) ("The Supreme Court has emphasized that the doctrine of mootness is more flexible than other strands of justiciability doctrine."). The question of mootness "focuses upon whether we can still grant relief between the parties. If an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal is moot and must be dismissed.... However, while a court may not be able to return the parties to the status quo ante ..., an appeal is not moot if the court can fashion some form of meaningful relief...." *In re Pattullo,* 271 F.3d 898, 901 (9th Cir.2001) (quoting *United States v. Arkison,* 34 F.3d 756, 759 (9th Cir.1994) (modifications in original) (quoting *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992))). We must examine whether relief against the ordinance's provisions could meaningfully improve Dream Palace's position; if it could not, then Dream Palace has no continuing stake in the outcome sufficient to survive a mootness challenge.

### 3

 The problem for Dream Palace is obvious: it is a *pre-existing* business, and the district court has previously ruled that the business license requirement cannot be applied to such businesses. That ruling has not been appealed. Since Dream Palace cannot be subject to the ordinance as it stands, it may at first be difficult to see how it has a "present, live controversy," *Hall,* 396 U.S. at 48, 90 S.Ct. 200, sufficient to go forward with its claim that the ordinance is also invalid with respect to *new* businesses.

However, the county has conceded in its brief and at oral argument that rather than challenging the district court's ruling with respect to pre-existing businesses like Dream Palace, it is in the process of amending those provisions so that the challenged restrictions will apply to preexisting businesses. At such time, the provisions Dream Palace now seeks to challenge can and will apply to Dream Palace and its employees. It therefore appears that Dream Palace is indeed "immediately in danger of sustaining some direct injury" as a result of the official conduct it seeks to challenge. *Id.*

In *Erie,* the owners of the plaintiff nude dancing club filed a motion to dismiss the case as moot, because the club had ceased to operate in Erie County after the Supreme Court had granted certiorari. 529 U.S. at 287, 120 S.Ct. 1382. The Supreme Court held that "[s]imply closing [the club] is not sufficient to render th[e] case moot" because of the possibility that the club owners "could again decide to operate a nude dancing establishment in Erie," in which case, the owners would once again be subject to the city ordinance. *Id.* Similarly, in *Clark v. City of Lakewood,* 259 F.3d 996 (9th Cir.2001), we considered a situation where an owner's license to operate an adult cabaret had expired after the district court had rendered a decision in the city's favor, and the owner had not sought renewal. *Id.* at 1011. We nonetheless held that the case was not moot

because of the plaintiff's "stated intention ... to return to business." *Id.* at 1012. Given the county's expressed intention to amend the ordinance so as to have it apply to Dream Palace, the possibility of immediate injury to the plaintiff in this case is more likely to come to pass than either of the scenarios contemplated in *Erie* and *Clark.* Dream Palace will soon be subject to the provisions it now seeks to challenge, and consequently, there is a "live controversy." *Hall,* 396 U.S. at 48, 90 S.Ct. 200. We are satisfied, therefore, that its overbreadth challenge to the business license requirement is not moot.

### C

Turning to the merits, Dream Palace asserts that the procedural safeguards with respect to the county's decision on a license application are insufficient to protect First Amendment rights.

■■■■ A prior restraint exists when the enjoyment of protected expression is contingent upon the approval of government officials. *Near v. Minnesota,* 283 U.S. 697, 711–13, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Since Ordinance P–10 requires all businesses which come within its purview to apply for and to obtain a license before engaging in business,[5] the licensing scheme is quite obviously a prior restraint, and properly analyzed as such. Prior restraints are not unconstitutional per se, however. *FW/PBS,* 493 U.S. at 225, 110 S.Ct. 596. The Supreme Court has said that to pass constitutional muster, a licensing scheme that regulates adult entertainment businesses must contain two procedural safeguards: First, "the licensor must make the decision whether to issue the license within a specified and reasonable period during which the status quo is maintained." *Id.* at 228, 110 S.Ct. 596. Second, "there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *Id.*[6]

### 1

■■■ First, Dream Palace claims that the ordinance is invalid because it places the burden of proof in the administrative appeals process on the applicant. *See* Ordinance P–10 § 18 ("Respondent shall have the burden of proving by a preponderance of the evidence that the denial ... was arbitrary or capricious and an abuse of discretion."). The fact the burden is on the applicant during these administrative proceedings is of no consequence, at least from the standpoint of the First Amendment. In *FW/PBS,* the Supreme Court rejected the argument that, in the event of *judicial* review, the regulator must bear the burden of proof once in court. *Id.* at 230, 110 S.Ct. 596. The Court reasoned that under the ordinance, "the city does not exercise discretion by passing judgment on the content of any protected speech," but merely engages in "a ministerial act that is not presumptively invalid."

5. Section 5 provides that "a person or enterprise may not conduct an adult oriented business without first obtaining an adult oriented business license...."

6. These two requirements were first set forth by the Supreme Court in *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). *Freedman* also held that the government bore the burden of going to court in order to justify the licensing scheme. *Id.* at 59–60, 85 S.Ct. 734. Justice O'Connor's three-judge plurality opinion in *FW/PBS*

dispensed with this third procedural safeguard in the context of adult business licensing schemes. *FW/PBS,* 493 U.S. at 229–30, 110 S.Ct. 596. In *Baby Tam & Co., Inc. v. City of Las Vegas,* 247 F.3d 1003 (9th Cir. 2001) ("*Baby Tam III*"), we followed the plurality opinion in *FW/PBS* and held that "placing the burden of instituting proceedings on the state does not apply to licensing schemes such as the one challenged here." *Id.* at 1008 (citing *FW/PBS,* 493 U.S. at 228–30, 110 S.Ct. 596).

*Id.* at 229, 110 S.Ct. 596. Furthermore, the applicant has a great deal at stake when a license application is denied, and as such "there is every incentive for the applicant to pursue a license denial through court." *Id.* at 230, 110 S.Ct. 596. For these reasons, the Court concluded that "the First Amendment does not require that the city bear the burden of going to court to effect the denial of a license application or that it bear the burden of proof once in court." *Id.*

Precisely the same circumstances arise here. In deciding whether to issue a license, the licensor "does not exercise discretion by passing judgment on the content of any protected speech." *Id.* at 229, 110 S.Ct. 596. Moreover, "[b]ecause the license is the key to the applicant's obtaining and maintaining a business," *id.* at 229–30, 110 S.Ct. 596, Dream Palace has an incentive vigorously to pursue administrative review of an adverse decision. We fail to see why the First Amendment would require the county to bear the burden in administrative review proceedings, but not in court. Requiring the applicant to bear the burden of proof in administrative proceedings is, therefore, valid under the First Amendment.

### 2

Second, Dream Palace argues that the ordinance fails to comply with the second of the *FW/PBS* requirements: that there be "the possibility of prompt judicial review." *FW/PBS*, 493 U.S. at 228, 110 S.Ct. 596.

### a

Dream Palace originally rested this argument on our holding in *Baby Tam & Co., Inc. v. City of Las Vegas,* 154 F.3d 1097 (9th Cir.1998) ("*Baby Tam I*"), that an adult business could not be subjected to a content-based licensing regime where "[t]here is no provision that a judicial hearing must be had or a decision must be rendered within a prescribed period of time." *Id.* at 1101. *Baby Tam I,* however, is no longer good law after the Supreme Court's decision in *City of Littleton v. Z.J. Gifts D–4, L.L.C.,* —— U.S. ——, 124 S.Ct. 2219, 159 L.Ed.2d 84 (2004). That case, decided after the parties' initial briefing in this case, now provides the framework for analyzing the judicial-review provision of Ordinance P–10.[7]

The Supreme Court's opinion in *City of Littleton* makes clear that the *FW/PBS* requirement of "prompt judicial review" must be read "as encompassing a prompt judicial decision." *Id.* at 2224. In other words, the First Amendment requires that an adult business subject to a licensing scheme not only have prompt *access* to the courts in the event the license is denied, but also receive a prompt *decision* from the courts on the legitimacy of such a denial. This follows, the Court explains, from two principles: first, that "the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech," *FW/PBS,* 493 U.S. at 228, 110 S.Ct. 596; and second, that "[a] delay in issuing a judicial decision, no less than a delay in obtaining access to a court, can prevent a license from being issued within a reasonable period of time." *City of Littleton,* 124 S.Ct. at 2224 (internal quotation marks omitted).

Our task, then, is to determine whether Ordinance P–10, read in its proper context within Arizona law, provides for a sufficiently prompt judicial determina-

---

**7.** The parties have filed supplemental briefs on the effect of *City of Littleton.* Dream Palace, in its brief, acknowledges that its original

argument relying on *Baby Tam I* is now without merit.

tion of the legitimacy of a license denial. *City of Littleton* provides the starting point for that determination. At issue in that case was a licensing ordinance enacted by the city of Littleton, Colorado. Like Ordinance P–10, the Littleton ordinance required adult businesses to obtain a license in order to operate; also like Ordinance P–10, it set out a list of objective circumstances that, if present, required the city to deny the license application. *City of Littleton*, 124 S.Ct. at 2222 (citing Littleton City Code §§ 3–14–2, 3–14–3, 3–14–5, 3–14–7, 3–14–8). The Littleton ordinance provided that the city's final licensing decision could be "appealed to the [state] district court pursuant to Colorado rules of civil procedure." *Id.* (citing Littleton City Code § 3–14–8(B)(3)).

The Supreme Court held that by providing for judicial review through the ordinary process of Colorado state courts, the ordinance "offer[ed] adequate assurance, not only that *access* to the courts can be promptly obtained, but also that a judicial *decision* will be promptly forthcoming." *Id.* at 2224. In so holding, the Court explicitly accepted the argument that "the First Amendment does not require special 'adult business' judicial review rules." *Id.* Rather, the Court held, the regular judicial process of the Colorado state courts was sufficient "as long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly." *Id.*

In effect, the Court in *City of Littleton* established a presumption that state courts function quickly enough, and with enough solicitude for the First Amendment rights of license applicants, to avoid the unconstitutional suppression of speech that arises from undue delay in judicial review.[8] The Court provided several rea-

sons why ordinary state-court procedures suffice. First, state courts have tools at their disposal to expedite proceedings when necessary. *Id.* at 2224–25. Second, there is no reason to doubt that state judges are willing to use those procedures when necessary to keep justice delayed from becoming justice denied; moreover, if some state court should fail in its duties, "federal remedies would provide an additional safety valve." *Id.* at 2225 (citing 42 U.S.C. § 1983). Third, the potential harm to First Amendment values is attenuated when the licensing decision depends on reasonably objective criteria, both because the use of objective criteria is "unlikely in practice to suppress totally the presence" of a certain form of protected expression, and because the use of objective criteria typically lends itself to "simple, hence expeditious" judicial review. *Id.* Fourth and finally, local governments often lack the legal authority to impose deadlines on state courts; thus, it is reasonable for them to depend on state-law procedural safeguards against undue delay. *Id.*

*City of Littleton's* presumption that regular state-court review is adequate applies equally to this facial challenge to Ordinance P–10. Each of the rationales for that presumption set out by the Court in *City of Littleton* applies here. First, the Arizona courts have procedural tools available should it be necessary to expedite the review of a license denial. *See* Ariz. R. Civ. P. 6(d) ("A judge of the superior court ... may issue an order requiring a party to show cause why the party applying for the order should not have the relief therein requested, and may make the order returnable at such time as the judge designates."); Ariz. R.P. Spec. Act. 4(c) ("[A] special action may be instituted with or

---

**8.** This presumption applies to facial challenges to licensing ordinances. *City of Littleton,* 124 S.Ct. at 2226. License applicants may still bring an as-applied challenge to argue that a state is failing to provide adequate judicial review.

without an application for an order to show cause why the requested relief should not be granted. ... If a show cause procedure is used, the court shall set a speedy return date."); Ariz. R.P. Spec. Act. 4(c) (state bar committee's note) ("Special actions which require urgent disposition may be expedited under the show cause procedure established by the Rule, with complete flexibility in the Court to control timing."); *see also Green v. Superior Court,* 132 Ariz. 468, 470, 647 P.2d 166 (1982) ("[B]y virtue of" Rule 4(c), "matters ... may be determined as expeditiously as is necessary"). The ordinance ensures an applicant maximum judicial flexibility by requiring the county to "consent to expedited hearing and disposition" in state court.

Second, there is no reason to doubt—and Dream Palace has not disputed—that Arizona courts will be solicitous of the First Amendment rights of license applicants. Moreover, as the Supreme Court noted, federal remedies under 42 U.S.C. § 1983 are available should county and state procedures fail to suffice.

Third, as in *City of Littleton,* the licensing decision under Ordinance P–10 depends on a set of reasonably objective factors. Section 10(d) provides that the director of the county planning department "shall grant the license" unless any of several conditions is met, and these conditions (for example, that the applicant is not underage and has complied with applicable zoning ordinances) are reasonably objective. State courts should therefore have little difficulty in ensuring that county officials do not wrongfully deny license applications that meet the ordinance's requirements.

■ Fourth, Maricopa County has no legal authority to impose deadlines on Arizona state courts. This fact, of course, would not ameliorate an otherwise unconstitutional prior restraint. When the First Amendment requires certain safeguards before a system of prior restraint may be enforced, a local government cannot evade that requirement by pointing to its lack of legal authority to ensure such safeguards exist. Nevertheless, nothing prevents a county from relying on state law procedures to ensure that First Amendment interests are adequately protected. *City of Littleton,* 124 S.Ct. at 2225; *cf. Graff v. City of Chicago,* 9 F.3d 1309, 1324 (7th Cir.1993) (en banc) (holding that it was constitutionally sufficient that review of licensing decisions was available by Illinois' common-law writ of certiorari). As long as those state procedures are themselves constitutionally adequate, the county will have satisfied the First Amendment's requirements.

In short, the ordinance in this case is similar in every relevant aspect to the ordinance upheld by the Supreme Court in *City of Littleton.* Moreover, Arizona's rules of procedure "provide for a flexible system of review in which judges can reach a decision promptly in the ordinary case, while using their judicial power to prevent significant harm to First Amendment interests where circumstances require," *City of Littleton,* 124 S.Ct. at 2226. Such rules of procedure satisfy the First Amendment.

b

■ In its supplemental briefing, Dream Palace advances two additional arguments for its claim that the ordinance does not provide constitutionally sufficient judicial review. First, it argues that under the "special action" procedure authorized by the ordinance, any review is purely at the court's discretion and hence not sufficiently guaranteed. Second, it argues that review in an Arizona special action is under an abuse-of-discretion standard, and that only *de novo* review is constitutionally adequate.

Dream Palace did not raise these arguments before the district court. Ordinarily, we decline to consider arguments raised for the first time on appeal. *Janes v. Wal–Mart Stores, Inc.*, 279 F.3d 883, 888 n. 4 (9th Cir.2002); *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir.1978). This rule serves to ensure that legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of the district court's prior analysis, and prevents parties from sandbagging their opponents with new arguments on appeal. We have, however, laid out several narrow exceptions to the rule—among them, the case in which "the issue is purely one of law, does not affect or rely upon the factual record developed by the parties, and will not prejudice the party against whom it is raised." *Janes*, 279 F.3d at 888 n. 4; *see also Patrin*, 575 F.2d at 712. That exception applies here. Dream Palace's new arguments are based entirely in law and do not rely on the factual record. Maricopa County will not be prejudiced by Dream Palace's failure to advance the arguments below; it has had, and has taken advantage of, a full opportunity to brief its response to the new arguments.

Even when a case falls into one of the exceptions to the rule against considering new arguments on appeal, we must still decide whether the particular circumstances of the case overcome our presumption against hearing new arguments. In this case, a decision of this Court bearing directly on the issue of judicial review of adult-business licensing decisions—*Baby Tam I*—was displaced by a Supreme Court decision after the proceedings in the district court were complete. Thus, Dream Palace made its decision to rely below on *Baby Tam I* within a very different legal landscape from the one that now obtains. For that reason, we exercise our discretion to consider the new arguments advanced by Dream Palace.

i

▮ First, Dream Palace argues that the "special action" review provided for by the ordinance is inadequate because, under Arizona law, the exercise of jurisdiction in a special action is purely at the court's discretion. Thus, it contends, there is no guarantee that a court will hear the merits of a denied license applicant's claim.

The Supreme Court's holding that a "prompt judicial determination must be available," *FW/PBS*, 493 U.S. at 239, 110 S.Ct. 596, would be drained of its force if it did not mean that a would-be licensee whose application is denied must have access to a court that is required to review the license denial on its merits. We must therefore determine whether Arizona law so provides.

Ordinance P–10 provides that a final denial of a license application may be appealed to the Superior Court (the state trial court) "by special action or other available procedure." As the Supreme Court emphasized in *City of Littleton*, nothing requires a state or local government to write the details of judicial review procedures into the licensing ordinance. *See* 124 S.Ct. at 2226. Thus, if there is any procedural route by which an applicant may obtain full review on the merits, we must reject Dream Palace's argument.

The parties vigorously dispute whether the "special action" proceeding is constitutionally sufficient. The special action is a proceeding under Arizona law, created by rule in 1970, that takes the place of the old common law writs of certiorari, mandamus, and prohibition. A special action may be instituted in Superior Court or in the appellate courts, *see* Ariz. R.P. Spec. Act. 4(a), but Ordinance P–10 authorizes appeal to the Superior Court and so it is that procedure that concerns us here.

When a plaintiff seeks special action review in the Superior Court, "the judge

must first exercise his discretion and decide whether to consider the case on its merits." *Bilagody v. Thorneycroft,* 125 Ariz. 88, 92, 607 P.2d 965, 969 (1979). Were this discretion unbounded, the special action would, of course, provide no guarantee of judicial review on the merits. If, on the other hand, the judge's "discretion" does not include the ability to dismiss a petition where it is the only route by which the petitioner can bring a constitutional challenge, then the mere use of the term "discretion" will not prevent the review from being constitutionally sufficient. Arizona law in this area is not entirely pellucid. The Arizona Supreme Court has noted that "[t]he decision to accept jurisdiction of a special action petition is highly discretionary with the court in which the petition is filed." *Gockley v. Ariz. Dept. of Corrections,* 151 Ariz. 74, 75, 725 P.2d 1108, 1109 (1986). This statement seems, on its face, to suggest that a court could dismiss a petition for reasons unrelated to the constitutional merits of the claim, leaving a petitioner without remedy. The Court of Appeals' decision in *Bilagody,* however, suggests that a Superior Court would be abusing its discretion—and hence subject to reversal—if it were the only available venue for, and yet refused to hear, a claim that a license denial violated the First Amendment. In *Bilagody,* the Arizona Court of Appeals considered a Superior Court judge's decision to decline jurisdiction over a special action in which the plaintiff challenged, on due process grounds, the state's suspension of his driver's license. *See* 125 Ariz. at 89–92, 607 P.2d at 966–69. The court affirmed the dismissal "on the basis that the appellant had available an adequate remedy by appeal," 125 Ariz. at 92, 607 P.2d at 969, but added:

Were we to conclude, however, that the due process issue could not subsequently be raised, it would be necessary to reconsider the scope of the trial court's discretion to refuse to decide the issue in a special action. As Justice Holmes once observed in another context: "(I)t is plain that a State cannot escape its constitutional obligations by the simple device of denying jurisdiction in such cases to Courts otherwise competent."

125 Ariz. at 92 n. 4, 607 P.2d at 969 n. 4 (quoting *Kenney v. Supreme Lodge of the World, Order of Moose,* 252 U.S. 411, 415, 40 S.Ct. 371, 64 L.Ed. 638 (1920)). The court's language here strongly suggests that it is not within the Superior Court's discretion to refuse to consider the merits of that claim unless some other avenue is open for the petitioner's challenge.[9]

Arguing otherwise, Dream Palace points us to language in *State ex rel. Dean v. City Court of City of Tucson,* 123 Ariz. 189, 598 P.2d 1008 (1979), where the Court of Appeals noted that "[t]he denial of special action relief is a discretionary decision which will be upheld for any valid reason disclosed by the record." 123 Ariz. at 192, 598 P.2d at 1011. We have no reason to think, however, that the Arizona courts would find any "reason" to be "valid" that would deny a license applicant the review on the merits that the Constitution requires. *Cf. City of Littleton,* 124 S.Ct. at 2225 (finding "no reason to doubt" that Colorado state judges would exercise their powers so as to avoid First Amendment harms). *Dean* itself did not deal with a constitutional claim; it merely upheld a Superior Court's decision not to review the City of Tucson's challenge to a municipal

---

9. If, for example, as we suggest below, an ordinary lawsuit or declaratory action would lie to contest a license denial, then a Superior Court might have discretion to dismiss a special action on that ground—but then (by hypothesis) the plaintiff would have constitutionally adequate judicial review through one of those procedural routes.

court's erroneous acquittal of a woman charged with a traffic violation, because double jeopardy principles would bar any further proceedings against her even if the City's claim were successful. At most, then, *Dean* held that denial of review in a special action proceeding is appropriate where a holding for the plaintiff would have no real effect. Thus, our reading of Arizona law inclines us to the view that the Superior Court does not have the kind of "discretion" over special action review that would render the process constitutionally insufficient. *Cf. Graff v. City of Chicago*, 9 F.3d 1309, 1324–25 (7th Cir.1993) (en banc).

In any event, we need not delve deeper into the vagaries of Arizona civil procedure law, because the special action is not the only procedure available to contest a license denial. Ordinance P–10 authorizes appeal from a denial not only by special action, but also by any "other available procedure." [10] That would include, for example, a regular lawsuit seeking an injunction against the enforcement of the ordinance after a contested license denial. It would also include a suit under Arizona's declaratory judgment statute, A.R.S. § 12–1831 *et seq.*, which provides that

> [a]ny person ... whose rights, status or other legal relations are affected by a ... municipal ordinance ... may have determined any question of construction or validity arising under the ... ordinance ... and obtain a declaration of rights, status or other legal relations thereunder.

A.R.S. § 12–1832. Dream Palace argues that this language authorizes a declaratory action only to determine the constitutionality or meaning of an ordinance, not to contest the denial of a license application. But the statute permits a plaintiff to "obtain a declaration of rights" under an ordinance, and Ordinance P–10 gives a qualified applicant the right to a license. *See* Ordinance P–10, § 10(d) ("The Director *shall grant* the license ... to an applicant who has completed all requirements for application, unless the Director finds any of the following conditions ...." (emphasis added)). We see no reason why a declaratory action would not lie under these circumstances. Because these procedural routes—a suit for an injunction and a declaratory action—are open to an applicant whose license is denied, we need not conclusively resolve the parties' debate over the sufficiency of the special action proceeding.

ii

Dream Palace also argues that review in an Arizona special action is inadequate because it is under a deferential abuse-of-discretion standard. We disagree with that characterization of Arizona law. A court in a special action considers not only whether the defendant has abused his discretion, but also "[w]hether the defendant has failed ... to perform a duty required by law as to which he has no discretion." [11] Ariz. Rules of Procedure for Special Actions 3(a). Ordinance P–10 imposes a duty

---

**10.** The fact that a denied applicant can seek review other than through a discretionary writ distinguishes this case from *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County, Tenn.*, 274 F.3d 377 (6th Cir.2001). In *Deja Vu*, the Sixth Circuit held that a licensing ordinance that *required* an applicant to seek judicial review, if at all, via a discretionary writ unconstitu-

tionally failed to guarantee a final judicial adjudication on the merits. *Id.* at 402–03.

**11.** Special action review also extends to the questions (1) "[w]hether the defendant has failed to exercise discretion which he has a duty to exercise"; (2) "[w]hether the defendant has proceeded or is threatening to proceed without or in excess of jurisdiction or legal authority"; and (3) "[w]hether a deter-

on the county planning director to issue a license unless certain disqualifying conditions obtain; it gives the director no discretion to deny a qualified application. A reviewing court will thus have no reason to defer to the director's decision.

Dream Palace, however, argues that a special action court will defer to the county's determination of whether the facts establish a disqualifying condition. Again, we do not think this contention accurately reflects Arizona law. It is true that the Arizona Court of Appeals has held, in a case not involving the First Amendment, that a court hearing a special action challenge to an administrative decision "may not weigh the evidence on which the decision was based." *Ariz. Dep't of Public Safety v. Dowd*, 117 Ariz. 423, 426, 573 P.2d 497, 500 (Ariz.Ct.App.1977). But the Arizona Supreme Court has held that "appellate courts must engage in independent review of 'constitutional facts' in order to safeguard first amendment protections." *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 482, 724 P.2d 562, 568 (1986) (citing *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). We have no reason to think that Arizona courts will not assiduously carry out their duty to ensure that meaningful judicial review is not evaded through biased fact-finding.

Finally, as discussed above, a special action is not the only judicial procedure available to a denied license applicant, who may also obtain review through a suit for an injunction or declaratory relief. Neither of those procedures calls for any heightened deference on the part of the state court.

### c

In light of *City of Littleton*, and having rejected both of Dream Palace's new arguments for its unconstitutionality, we are satisfied that Ordinance P–10 provides the opportunity for both access to judicial review and a prompt judicial decision, as the First Amendment requires. Of course, if some undiscovered quirk of state procedure were to prevent an applicant from receiving meaningful judicial review, a challenge to the ordinance as applied would lie in federal court. *See City of Littleton*, 124 S.Ct. at 2225 (citing 42 U.S.C. § 1983); *see also id.* at 2228 (Souter, J., concurring in part and in the judgment) ("If there is evidence of foot-dragging, immediate judicial intervention will be required, and judicial oversight or review at any stage of the proceedings must be expeditious.").

### IV

Dream Palace also contests the adequacy of the procedural safeguards in the ordinance to sustain the validity of the prior restraints involved in the manager and dancer work permit requirements.

### A

Sections 7 and 8 of the ordinance provide that adult-oriented business managers [12] and adult service providers [13] may

---

mination was arbitrary and capricious or an abuse of discretion." Ariz. R.P. Spec. Act. 3.

**12.** An adult-oriented business manager is "a person on the premises of an adult oriented business who is authorized to exercise overall operational control of the business." *See* Ordinance P–10 § 2.

**13.** An adult service provider is "any person who provides an adult service." *Id.* An adult

service is "dancing, serving food or beverages, modeling, posing, wrestling, singing, reading, talking, listening or other performances or activities conducted for any consideration in an adult oriented business by a person who is nude or seminude during all or part of the time that the person is providing the service." *Id.*

not work in an adult entertainment establishment unless they first secure permits. Ordinance § 7, 8. Application for said permits "shall be made in the same manner as application for an adult business license...." *Id.* The upshot is that all of the procedural safeguards with respect to the issuance of *business licenses*—the requirement of a speedy decision, and the provisions for administrative appeals and judicial review—apply equally to applications for work permits. Permit applicants are provided with an additional safeguard: upon receipt of a properly filed application, the county is required to issue a temporary permit to the applicant, *see id.* § 10(b), and in the event of an adverse decision on the application, the temporary permit remains in place until the exhaustion of the administrative and judicial review of that decision. *See id.* §§ 18, 19.

## B

### 1

■ First, Dream Palace renews its argument that placing the burden of proof on managers and dancers in the administrative proceedings violates their First Amendment rights. For the reasons we previously stated, we reject this argument. *See supra* section III.C.1. Because the county "does not exercise discretion by passing judgment on the content of any protected speech," *FW/PBS*, 493 U.S. at 229, 110 S.Ct. 596, and because permit applicants have every incentive vigorously to pursue an administrative remedy in the event of an adverse decision on an application, requiring permit applicants to bear the burden of proof is valid under the First Amendment.

### 2

■ Second, Dream Palace argues that requiring managers and dancers to exhaust their administrative remedies prior to seeking judicial review constitutes a pri-

or restraint. We reject this argument: we read nothing in the Supreme Court's decision in *FW/PBS* that signals disapproval with the common requirement that an applicant exhaust administrative remedies prior to seeking judicial review. We reiterate that the critical issues with respect to the applicant's First Amendment rights are "a specified and reasonable period during which the status quo is maintained," and the "possibility of prompt judicial review." *Id.* at 228, 110 S.Ct. 596.

Requiring administrative exhaustion implicates neither of these two constitutional prerequisites. The ordinance guarantees a "specified and reasonable time" within which an administrative decision must be made, and the applicant, temporary permit in hand, may continue to work pending the outcome of administrative and judicial review. *See* Ordinance P–10 § 10(b), 18, 19. *FW/PBS's* requirements are therefore satisfied. In *4805 Convoy*, we held that "*[o]nce administrative remedies have been exhausted,* a party whose license has been suspended or revoked may seek judicial review." 183 F.3d at 1114 (emphasis added). We make explicit now what was implicit in our decision in *4805 Convoy:* requiring applicants to exhaust administrative remedies prior to seeking judicial review does not violate the First Amendment, so long as an administrative decision is rendered within a specified, reasonable time, "during which time the status quo is maintained." *FW/PBS*, 493 U.S. at 228, 110 S.Ct. 596.

### 3

■ Finally, Dream Palace's argument that placing the burden of seeking judicial review on managers and dancers constitutes a prior restraint is foreclosed by our decision in *Baby Tam III. See infra* n. 6. In *Baby Tam III*, we held that "placing the burden of instituting proceedings on the state does not apply to licensing

schemes such as the one challenged here." 247 F.3d at 1008.

## V

Dream Palace's next challenge is to the disclosure requirements with respect to manager and employee work permit applications. Section 6 of the ordinance specifies the process applicants must follow in applying for a work permit, pursuant to which permit applicants are required to submit information regarding their full true names, including "aliases or stage names" previously used, as well their current residential address and telephone numbers. Section 9 in turn provides that any information a permit applicant submits to the county "shall be maintained in confidence ... subject only to the public record laws of the State of Arizona." Dream Palace's argument proceeds in two steps: First, it argues that requiring such disclosure *by itself* is invalid under the First Amendment. Second, and in the alternative, it asks for injunctive relief against disclosure of said information to the public. We take each step in turn.

## A

■■■ Dream Palace's assertion that requiring disclosure of information regarding names, addresses, and telephone numbers to the county violates the First Amendment is essentially foreclosed by our decision in *Kev, Inc. v. Kitsap County*, 793 F.2d 1053 (9th Cir.1986). In *Kev*, we considered a challenge to a city ordinance requiring nude dancers applying for a work permit to provide to the city their name, phone number, birth date, and aliases, past and present. *Id.* at 1059. We found that requiring disclosure of such

information would not "discourage ... a prospective dancer from performing. None of the information required by the County unreasonably diminishes the inclination to seek a license." *Id.* Because the required disclosure did not "inhibit[] the ability or the inclination to engage in the protected expression," it was a valid licensing requirement. *Id.* at 1060. The required disclosures under the ordinance at issue in this case, and the city ordinance at issue in *Kev*, are indistinguishable, and *Kev* therefore controls.[14]

## B

■■■ Dream Palace urges in the alternative that, even if we find the required disclosures to the County valid, we should grant injunctive relief to prevent the county from disclosing that information to the public. The requirements for the issuance of a permanent injunction are (1) the likelihood of substantial and immediate irreparable injury; and (2) the inadequacy of remedies at law. *G.C. & K.B. Investments, Inc. v. Wilson*, 326 F.3d 1096, 1107 (9th Cir.2003). The district court's refusal to grant a permanent injunction is reviewed for an abuse of discretion. *Id.*

■■■ The potential First Amendment problem here arises from the interplay between county and state law. While Section 9 of the ordinance provides that "information provided by an applicant in connection with the applicant for a license or permit under this ordinance shall be maintained in confidence by the Director," that confidentiality protection is "subject ... to the public record laws of the State of Arizona." Arizona law in turn provides that "[p]ublic records and other matters in

---

14. We note that several other courts have struck down remarkably similar provisions to the one at issue in *Kev* and at issue in this case. *See, e.g., LLEH, Inc. v. Wichita County*, 289 F.3d 358, 370 (5th Cir.2002) (disclosure of "current residential address and telephone number" was not narrowly tailored); *Schultz v. City of Cumberland*, 228 F.3d 831, 852 (7th Cir.2000) (invalidating provision requiring disclosure of residential address and other information).

the custody of *any* officer *shall* be open to inspection by *any person* at *all times* during office hours." Az.Rev.Stat. § 39–121 (emphasis added). The county does not dispute that applicant information provided to the county is a "public record" within the meaning of this provision, and that those records are "presumed open to the public for inspection as public records." *Carlson v. Pima County,* 141 Ariz. 487, 490, 687 P.2d 1242 (1984). The public right of inspection may be overcome in the interest of "confidentiality, privacy, or the best interests of the state." *Id.* The State, however, "has the burden of overcoming the legal presumption favoring disclosure." *Scottsdale Unified School District No. 48 of Maricopa County v. KPNX Broadcasting Co.,* 191 Ariz. 297, 300, 955 P.2d 534 (1998) (quoting *Cox Az. Pubs., Inc. v. Collins,* 175 Ariz. 11, 14, 852 P.2d 1194 (1993)).

The potentially dangerous consequences that the interplay of these rules poses to permit applicants is obvious. Should an erotic dancer, say, wish to apply for a work permit, as required by the ordinance, he or she must provide information regarding true name, including aliases or other names used in the past five years, as well as current home address and telephone number. Under Arizona law, that information is *presumptively* available to anybody who pleases to ask for it, and the county, though it *may* refuse to provide such information to the public, has the burden in subsequent proceedings of overcoming the statutory presumption in favor of disclosure. The "confidentiality" provision included in the ordinance is essentially a nullity, because that provision is made "subject ... to the public record laws of the State of Arizona." Ordinance P–10 § 6. The exception therefore swallows the rule.

The Sixth Circuit confronted a similar problem in *Deja Vu of Nashville, Inc. v.*

*The Metropolitan Gov. of Nashville & Davidson County, TN.,* 274 F.3d 377 (6th Cir.2001). The Nashville ordinance at issue in that case required permit applicants to divulge certain personal information about themselves, including their current and former residential addresses. *Id.* at 393. That information was presumptively available to the public pursuant to the Tennessee Open Records Act. *See id.* at 394. The court found there was "significant evidence that the requirement that applicants submit their names and past and current addresses to a public forum poses serious risks to their personal security." *Id.* at 394. The court concluded that "permit applicants' names and current and past residential addresses constitute[s] protected private information" and therefore it was "exempted from Tennessee's Open Records Act." *Id.* at 395.

In *N.W. Enterprises, Inc. v. City of Houston,* 352 F.3d 162 (5th Cir.2003), the Fifth Circuit reasoned similarly in reversing a Texas district court's injunction against a Houston ordinance that required employees and managers of adult entertainment businesses to divulge information regarding phone numbers and addresses to the city when applying for a permit. *Id.* at 195. The court held that state law already rendered the information confidential and unavailable to the public; thus, it reasoned, requiring applicants to supply the information did not infringe their First Amendment rights. *Id.* The Fifth Circuit panel therefore reversed the Texas district court's injunction. It did not disagree that where there is no guarantee of confidentiality, "concerns about public disclosure ... are not inconsequential." *N.W. Enters. v. City of Houston,* 27 F.Supp.2d 754, 842 (S.D.Tex.1998), *rev'd in part,* 352 F.3d at 198. As the district court in *N.W. Enterprises* reasoned:

Adult entertainers may anonymously (or through stage names) put their bodies

on display in front of strangers, but these actions do not imply a willingness to publicize the entertainers' personal information through which customers or other private persons may trace the entertainers to their homes or otherwise invade their privacy without permission. The fact that an entertainer is willing to dance publicly or a manager is willing to be employed in a sexually oriented business that deals with the public, or the fact that a determined harasser or stalker might conceivably follow an entertainer home after she leaves work, does not mean that adult entertainers and managers have voluntarily sacrificed all privacy rights and need for safety protections.

*Id.* at 842–43.

In *Clark*, we ourselves recognized the potential danger from public disclosure of information provided to the government in the course of applying for a work permit posed for nude dancers, albeit in the course of deciding whether or not an owner-operator of a nude dancing club had overbreadth standing to raise the rights of his managers and employees. *See Clark,* 259 F.3d at 1010. We recognized in that case the possibility "that cabaret patrons could obtain such personal information and harass the entertainers at their homes, or worse." *Id.* at 1010. Because of the potential danger, we concluded that "there is a risk cabaret employees will engage in self-censorship and avoid participating in protected activity . . . ." *Id.*

■ We agree with this analysis. The First Amendment does not permit the county to put employees of adult entertainment establishments to the choice of either applying for a permit to engage in protected expression in circumstances where they expose themselves to "unwelcome harassment from aggressive suitors and overzealous opponents" of such activity, *N.W. Enters.,* 27 F.Supp.2d at 842, or of choosing *not* to engage in such activity out of concern for their personal safety. The chilling effect on those wishing to engage in First Amendment activity is obvious. Given the choice with which they are faced, we think it likely that those willing to engage in such activity will decline to do so, and Dream Palace has introduced affidavit testimony to that effect.

Because the interplay of county and state law on this point "inhibits the ability or the inclination to engage in . . . protected expression," *Kev,* 793 F.2d at 1060 (citing *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945)), we must conclude that the district court abused its discretion in refusing to enjoin the county from disclosing to members of the public information provided to it from permit applicants. Upon remand, the district court shall grant an appropriate injunction in accordance with this opinion.

## VI

### A

We turn now to Dream Palace's challenges to certain operating restrictions contained in the ordinance, the first of which is to the prohibition on the provision of adult services between the hours of 1:00 a.m. and 8:00 a.m. on Monday through Saturday or between the hours of 1:00 a.m. and 12:00 noon on Sunday. *See* Ordinance P–10 § 13(f). Our consideration of Dream Palace's challenge is largely controlled by our recent decision in *Fair Public Policy v. Maricopa County,* 336 F.3d 1153 (9th Cir.2003). In that case, we joined six other circuits [15] in holding that

---

**15.** *See DiMa Corp. v. Town of Hallie,* 185 F.3d 823 (7th Cir.1999); *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358 (11th Cir. 1998); *Richland Bookmart, Inc. v. Nichols,* 137 F.3d 435 (6th Cir.1998); *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731

hours of operation restrictions on adult entertainment businesses were constitutional under the secondary effects test so long as the "predominate concerns" motivating the ordinance were "the secondary effects" of adult speech. *See id.* at 1160. Of course, that we have established the *general* proposition that hours of operation restrictions may pass muster under the First Amendment does not relieve us of our duty to put the county to its proof in *this* case. *Compare DiMa Corp.*, 185 F.3d at 826 (Seventh Circuit holds town ordinance regulating hours of operation valid under *Renton* ), *with Schultz*, 228 F.3d at 846 (Seventh Circuit evaluates anew whether city has met its evidentiary burden under *Renton* ).

The familiar three-part analytical framework established in *Renton* applies.[16] First, we must determine whether the regulation is a complete ban on protected expression. *Renton*, 475 U.S. at 46, 106 S.Ct. 925. Second, we must determine whether the county's purpose in enacting the provision is the amelioration of secondary effects. *Id.* at 47. If so, it is subject to intermediate scrutiny, and we must ask whether the provision is designed to serve a substantial government interest, and whether reasonable alternative avenues of communication remain available. *Id.*

**B**

**1**

Our first task is to determine whether § 13(f) amounts to a complete ban on protected expressive activity. *Renton*, 475 U.S. at 46, 106 S.Ct. 925; *Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (plurality opinion); *Fair Public Policy*, 336 F.3d at 1164. Section 13(f) is obviously not a complete ban, prohibiting as it does the provision of adult services during certain nighttime hours and until noon on Sundays. "The ordinance is therefore properly analyzed as a time, place, and manner regulation." *Renton*, 475 U.S. at 46, 106 S.Ct. 925.

**2**

■ Second, we must determine whether section 13(f) is designed to combat the secondary effects of adult entertainment establishments on the surrounding community, "namely at crime rates, property values, and the quality of the city's neighborhoods." *Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (plurality opinion). We look to the full record to determine whether the purpose of the statute is to curb secondary effects. *Fair Public Policy*, 336 F.3d at 1165 (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 552 (9th Cir.1998)). In doing so, we will "rely on all objective indicators of intent, including the face of the statute, the effect

---

(1st Cir.1995); *Mitchell v. Comm'n on Adult Enter. Est. of the State of Delaware*, 10 F.3d 123 (3d Cir.1993); *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074 (5th Cir.1986).

**16.** In *Fair Public Policy*, we rejected the contention that Justice Kennedy's separate concurrence in *Alameda Books* signaled a departure from the traditional *Renton* analysis. *Id.* at 1162–63. As we explained, the argument that Justice Kennedy meant to require heightened scrutiny of restrictions of the type at issue here "cannot be squared with his insistence that 'the central holding of *Renton* re-

mains sound.'" *Id.* at 1162 (quoting *Alameda Books*, 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring)). Nor is the proposition that a new and different approach is required in the wake of his concurrence consistent with the weight of authority in the wake of that decision. *See id.* at 1163. (citing *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 721 (7th Cir.2003), *Z.J. Gifts D–4, LLC v. City of Littleton*, 311 F.3d 1220, 1239 n. 15 (10th Cir.2002), and *World Wide Video of Wash., Inc. v. City of Spokane*, 227 F.Supp.2d 1143, 1149 (E.D.Wash.2002)).

of the statute, comparison to prior law, facts surrounding enactment, the stated purpose, and the record of proceedings." *Colacurcio,* 163 F.3d at 551 (internal quotation omitted).

All objective indicators are that, in prohibiting the provision of adult service during nighttime hours, the county's predominant concern was with the amelioration of secondary effects. As with the statute at issue in *Fair Public Policy,* section 13(f) here applies to establishments protected by the First Amendment—adult movie theaters, book stores and video stores— and establishments that enjoy no such protection: massage parlors. *See* Ordinance P–10 § 2. *Fair Public Policy,* 336 F.3d at 1165. Justice Kennedy in *Alameda Books* found it significant that the ordinance at issue in that case was "not limited to expressive activities. It also extends . . . to massage parlors, which the city has found to cause similar secondary effects." 535 U.S. at 447, 122 S.Ct. 1728 (Kennedy, J., concurring).

Section 1 of the ordinance, moreover, amounts to a declaration of purpose, wherein the county board acknowledges that "adult oriented businesses may and do generate secondary effects that are detrimental to the public health, safety and welfare." Specifically, those secondary effects include prostitution, drug abuse, health risks associated with HIV/AIDS, and infiltration and proliferation of organized crime for the purpose of drug and sex related business activities. *Id.* Specifically, for our purposes, section 1 states that the "Board of Supervisors finds that the harmful secondary effects of adult oriented businesses are more pronounced when conducted continuously or during late night hours." The "stated purpose" is yet another objective indicator of the board's intent. *See Colacurcio,* 163 F.3d at 552.

Finally, all of the pre-enactment evidence before the board deals with the secondary effects associated with adult entertainment establishments. Board members were presented with a memo summarizing some seventeen secondary effects studies, and were provided with copies of secondary effects studies from Phoenix and Los Angeles. The board also held public hearings at which they heard testimony with respect to the need for reasonable regulation of adult-oriented establishments so as to curb the secondary effects associated with said establishments. *See Fair Public Policy,* 336 F.3d at 1167 (noting all documentary and testimonial evidence presented to Arizona legislature dealt with secondary effects). In short, an examination of the record in this case leads ineluctably to the conclusion that, in seeking to regulate the hours of operation of adult-oriented establishments, the county's predominant purpose was the amelioration of secondary effects. *Colacurcio,* 163 F.3d at 552; *Fair Public Policy,* 336 F.3d at 1165–66.

### 3

Since the county's purpose was to target secondary effects, the hours of operation restriction will be upheld if it is designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues of communication. *Renton,* 475 U.S. at 50, 106 S.Ct. 925; *Fair Public Policy,* 336 F.3d at 1166.

### a

The county has a substantial interest in curbing the secondary effects associated with adult entertainment establishments. *See Young,* 427 U.S. at 71, 96 S.Ct. 2440 (finding city's "interest in attempting to preserve the quality of urban life is one that must be accorded high

respect."). We recognized in *Fair Public Policy* that the specific interest in reducing secondary effects associated with late night operations is a substantial one. 336 F.3d at 1166; *see also National Amusements*, 43 F.3d at 741 (city has a substantial interest in preserving peace and tranquility for citizens during late evening hours); *Richland Bookmart*, 137 F.3d at 440–41 (deterring "prostitution in the neighborhood at night or the creation of 'drug corners' on the surrounding streets" is a substantial interest).

Under *Renton*, of course, the critical issue is whether or not the state has come forward with evidence demonstrating a connection between the speech regulated and the secondary effects that motivated the adoption of the ordinance. *Alameda Books*, 535 U.S. at 441, 122 S.Ct. 1728 (plurality opinion) (discussing *Renton* test). The evidentiary burden is not high: the county will prevail as long as it can demonstrate that it relied on evidence that is "reasonably believed to be relevant for demonstrating a connection between speech and a substantial independent government interest." *Id.*

The pre-enactment evidence before the Maricopa County Board consists of certain documentary evidence. Board members were provided with four-page and four-teen-page reports summarizing the findings of secondary effects studies conducted in various other cities and counties. Board members were also provided with copies of secondary effects studies conducted in Phoenix, Arizona, and Los Angeles, California. The board also heard limited testimonial evidence concerning the need for regulation to curb secondary effects on surrounding neighborhoods.

All of this evidence fairly supports the rationale behind § 13(f): namely, prohibiting adult entertainment establishments from operating during late night hours will lead to a reduction in secondary effects.

The record in this case compares favorably to the record found to pass muster in *Fair Public Policy*, 336 F.3d at 1168. In that case, we characterized the pre-enactment record as "a slim one." *Id.* at 1167. It consisted of letters on the record documenting the problems associated with adult entertainment businesses, as well as testimonial evidence regarding the late night effects of such establishments. *Id.* The evidence before the Maricopa County Board also compares favorably to the record in *Mitchell*, where lawmakers "received no documents or any sworn testimony in support of the bill." 10 F.3d at 133. Yet the Third Circuit in *Mitchell* held that the state had met its evidentiary burden under *Renton*. In *Ben Rich Trading*, all that the city relied on was evidence presented to the state legislature two-years previously. 126 F.3d at 161. In that case, too, the city had met its burden under *Renton*. *See id.*

The question is whether the county board relied on evidence "reasonably believed to be relevant" in demonstrating a connection between its rationale and the protected speech, and it has done that here. The answer is that the county board considered comprehensive summaries detailing findings from other jurisdictions, examined two full studies from Los Angeles and Phoenix, and heard limited testimonial evidence concerning the need for reasonable regulation. All of the evidence it considered is both "reasonable and relevant, and compares favorably with the evidence presented in other cases." *Fair Public Policy*, 336 F.3d at 1168. Since Dream Palace has failed to cast doubt on the state's theory, or on the evidence the state relied on in support of that theory, our precedent "commands that [we] should not stray from a deferential standard in these contexts, even when First Amendment rights are implicated through secondary effects." *Charter Comm's, Inc. v.*

*County of Santa Cruz,* 304 F.3d 927, 932 (9th Cir.2002). We are satisfied that the County has met its burden under *Renton.*

### b

The narrow tailoring requirement is satisfied so long as the government's asserted interest "would be achieved less effectively absent the regulation." *Colacurcio,* 163 F.3d at 553 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Plainly, the government's interest in curbing the secondary effects associated with late night operation of adult entertainment businesses would be achieved less effectively in the absence of § 13(f).[17] We conclude that the ordinance's hours of operation provision satisfies the narrow tailoring requirement.

### c

 Finally, the ordinance must "leave open ample alternative channels for communication." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. As with the statute at issue in *Fair Public Policy,* 336 F.3d at 1170, section 13(f) permits the businesses that come within its purview to operate seventeen hours per day Monday through Saturday, and thirteen hours on Sunday, or approximately 5,980 hour per year. It therefore

leaves open ample alternative channels for communication. The hours of operation restriction is therefore valid under the First Amendment.[18]

### VII

 Dream Palace next challenges the requirement that managers must wear an identification card during work hours. Pursuant to section 12 of the ordinance, managers are provided with a "work identification card," which contains a photograph, a permit number, and the date of expiration of the permit. Section 13(i) in turn provides that a manager "shall wear his or her identification" at all times during work hours. The card must be affixed to the front of the manager's clothing, so that the picture and permit numbers are clearly visible. Ordinance P–10 § 13(h).

At oral argument, Dream Palace conceded that its primary concern with respect to this requirement was the possibility that an unsatisfied customer, armed with a manager's permit number from the manager's identification card, may proceed to the county offices and make a request pursuant to Arizona's Public Records Act for the manager's home address and telephone number. It further conceded that

---

17. Dream Palace argues that section 13(f) is overly-broad because it prohibits the provision of "sexually related activities" prior to noon on Sundays, but we rejected this argument in *Fair Public Policy.* This argument "confuses the requirement that a regulation serve a substantial government interest with the requirement that it be narrowly tailored to that end." *Id.* at 1169 (quoting *Lady J. Lingerie,* 176 F.3d at 1365). The sort of line-drawing Dream Palace urges us to engage in "is inconsistent with a narrow tailoring requirement that only prohibits regulations that are substantially broader than necessary." *Id.* (internal quotation marks omitted).

18. We note also that there is no merit to Dream Palace's contention that the hours of operation restriction is unconstitutionally

"underinclusive" because it singles out adult entertainment establishments for "special treatment." Dream Palace repeats this "underinclusiveness" argument with respect to several other provisions in the ordinance. We rejected precisely the same argument in *Fair Public Policy,* and we do so again. Simply put, the *Renton* framework is *all about* singling out adult and erotic entertainment, so long as the government does so for the right reasons. "[T]he State may legitimately use the content of these materials as the basis for placing them in a different classification...." *Young,* 427 U.S. at 70–71, 96 S.Ct. 2440. *See also Isbell v. City of San Diego,* 258 F.3d 1108, 1116 (9th Cir.2001) (the state "may choose to treat adult businesses differently from other businesses").

should we grant relief with respect to the disclosure requirements, it no longer objects to section 13(i)'s identification requirement. Since we are instructing the district court to enter an injunction prohibiting public disclosure of that information pursuant to such a request, *see supra* section V.B, the basis for Dream Palace's challenge vanishes. Hence, we conclude that this portion of Dream Palace's challenge is moot.

## VIII

 Dream Palace also challenges the requirement that managers obtain work permits in the first place, claiming there is no evidence in the legislative record to support the county's position that licensing managers aids in its efforts to combat secondary effects, and that therefore the requirement is invalid under *Renton.* Like any other restraint upon nude dancing, the manager permit requirement can be imposed only if it is a reasonable time, place, and manner restriction. *See Clark,* 259 F.3d at 1005; *United States v. Baugh,* 187 F.3d 1037, 1042 (9th Cir.1999).

The legislative record in this case indicates that adult businesses are associated with a variety of secondary effects, such as the presence of organized crime and money laundering, which directly involve employees in management positions. It is reasonable for the county to suppose that it can combat these negative secondary effects by the permit process, which screens out potential managers with a criminal history. The other secondary effects associated with adult clubs—sex and drug offenses, health risks, and the like—can all be controlled to some extent by management-level employees. The record therefore contains ample evidence to support the requirement that a manager first obtain a license. The county has met its burden of demonstrating a connection between the burden it imposes on speech and a substantial government interest.

*Alameda Books,* 535 U.S. at 441–42, 122 S.Ct. 1728 (plurality opinion).

## IX

Dream Palace's challenge to the ban on "specific sexual activity" presents a much more difficult question. The prohibition has to be understood in the context of several other provisions in the ordinance, starting with the proposition that the ordinance regulates "adult oriented businesses." Those businesses are "adult arcades, adult bookstores or adult video stores, cabarets, adult live entertainment establishments, adult motion picture theaters, adult theaters, [and] massage establishments that offer adult service or nude model studies." Ordinance P–10 § 2. Each of these terms is in turn defined under the ordinance. An "adult live entertainment establishment," of which Dream Palace is one, is an establishment that features "persons who appear in a state of nudity" or "live performances that are characterized by the exposure of specific anatomical areas or specific sexual activities." *Id.* Each of the business definitions incorporates the term "specific sexual activity."

"Specific sexual activity," in turn, means any of the following: (1) "human genitals in a state of sexual stimulation or arousal"; (2) "sex acts, normal or perverted, actual or simulated, including acts of human masturbation, sexual intercourse, oral copulation or sodomy"; (3) "fondling or other erotic touching of the human genitals, pubic region, buttocks, anus or female breast"; and (4) "excretory functions as part of or in connection with any of the activities" listed above. *Id.*

Section 13(e), the challenged provision, provides that an "adult service provider, in the course of providing an adult service, may not perform a specific sexual activity." An adult service is, among other things,

"dancing, ... modeling, posing, ... singing, reading, talking, listening or other performances or activities ... by a person who is nude or seminude." *Id.* § 2. Nude, nudity or a "state of nudity" means "[t]he appearance of a human anus, or female breast below a point immediately above the top of the areola" or "[a] state of undress which fails to opaquely cover a human anus, genitals or female breast below a point immediately above the top of the areola." *Id.* Seminude means "a state of dress in which clothing covers no more than the genitals, pubic region and female breast below a point immediately above the top of the areola, as well as portions of the body that are covered by supporting straps or devices."

## A

Section 13(e) proscribes activity that comes within the First Amendment's protections. In prohibiting dancers from engaging in "simulated sex acts," whatever they may be, the county appears to have proscribed the particular movements and gestures that a dancer may make during the course of a performance. One is left to speculate as to what movements, precisely, a dancer may incorporate in a performance without running afoul of section 13(e), and yet still effectively convey an essentially adult, erotic, message to the audience. The prohibition applies even if the dancer is at least partially clothed. If Elvis' gyrating hips can fairly be understood to constitute a "simulated sex act," one can fully appreciate the potential scope of the restrictions placed on erotic dancers in Maricopa County.

The problem lies in the circularity of the ordinance's logic: Section 13(e) forbids certain expressive activity—simulated sex acts—*only* within adult-oriented businesses but not elsewhere. But the ordinance defines adult-oriented businesses as those that feature performances "characterized by the exposure of specific anatom-ical areas or specified sexual activities." The ordinance defines adult entertainment businesses by reference to the presentation of adult live entertainment, then forbids that presentation. To wit, Dream Palace is an adult entertainment business because it features nude and semi-nude dancers engaging in "specific sexual activity," and as a result, it is prohibited from featuring nude or semi-nude "specific sexual activity." Dream Palace therefore finds itself in a catch–22: there is no way for it to comply with the ordinance, unless it simply ceases to engage in protected expression entirely, and hence falls outside of the scope of the ordinance altogether.

## B

This is a total ban on nude and semi-nude dancing in everything but name, and indeed the county concedes as much, arguing that it is empowered to effect such a ban on the specific movements a dancer may, or more precisely may not, make, pursuant to its general police power. It relies on *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), and *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), for this proposition.

In *LaRue*, the Supreme Court upheld a facial challenge to California regulations enacted in response to live sex shows and sexual contact between nude performers and patrons in establishments licensed to sell liquor. 409 U.S. at 111, 93 S.Ct. 390. The record in that case was "a sordid one," and consisted of testimony regarding customers engaging in oral copulation with dancers, public masturbation, and numerous other contacts between male customers and female performers. *Id.* The Court concluded that the regulation was permissible because of the "critical fact ... that California has *not* forbidden these performances across the board. It has mere-

ly proscribed such performances in establishments it· licenses to sell liquor by the drink." *Id.* at 118, 93 S.Ct. 390 (emphasis added). The Court stated that the Twenty–First Amendment required an "added presumption in favor of the validity of state regulation in this area." *Id.* The Court later disowned its reliance on the Twenty-first Amendment in *44 Liquormart,* 517 U.S. at 514–16, 116 S.Ct. 1495, stating that "the States' inherent police powers provide ample authority to restrict the kind of 'bacchanalian revelries' described in the·*LaRue* opinion regardless of whether alcoholic beverages are involved .... *see, e.g., Young* [and] *Barnes* ...." *Id.* at 515, 116 S.Ct. 1495.

*LaRue* and *44 Liquormart* do not support the county's proposition. *LaRue* rested squarely on the "critical fact" that California had not enacted an "across the board" ban, but rather prohibited such performances in establishments it licenses to sell alcohol. That is not the case here; the Maricopa County ban on "specified sexual activities" is sweeping in its scope, and is not limited to establishments holding a liquor license. More important, the record before the legislature in *LaRue* spoke more to a "gross sexuality than of communication," 409 U.S. at 118, 93 S.Ct. 390, and contained a litany of recorded incidents of open copulation between the dancers and patrons, as well as public masturbation, prostitution, and the like.

The ordinance, however, strictly prohibits *any* contact between patrons and performers. *See* Ordinance P–10 § 13(j). Further, the stage on which performances take place must be elevated, patrons must stay at least three feet away from performers, and are separated from them by a barrier or a railing, over which neither a patron nor a performer may extend "any part of his or her body." *Id.* § 13(d). All performances must take place within a manager's sight line, *id.* § 13(g), and pa-

trons are prohibited from tipping performers ·while the performer is "nude or semi-nude." · *Id.* § 13(*l* ). The county has taken reasonable steps to guard against the kind of "gross sexual conduct" or "bacchanalian revelries" that were the target of the regulation in *LaRue.*

*After* the ordinance takes those steps, however, it goes further, and restricts the *particular* movements and gestures a dancer may or may not make during the course of a performance. *44 Liquormart* did not suggest, as the county contends, that the government may, pursuant to its "general police power," restrict constitutionally protected expression. The Court's citations to *Young* and *Barnes* immediately after the passage on which the county relies, both cases that apply First Amendment scrutiny to ordinances regulating adult entertainment businesses, make this amply clear. Whatever the scope of the county's asserted police power, it "must be exercised within constitutional limits." *Moore v. East Cleveland,* 431 U.S. 494, 514, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring).

### C

The county's fallback argument is that section 13(e) ·is valid under *Renton.* While the county is on firmer ground here, we remain unconvinced of the soundness of its position. *Renton* and its progeny do not give carte blanche to the government to proscribe absolutely certain types of adult entertainment. Rather, *Renton* effects a common-sense balance between the government's undoubted interest in curbing the effects such businesses have on surrounding communities on the one hand, and the enjoyment of, and practice in, protected expression on the other. Its rationale is that· content-discriminatory time, place, and manner regulations receive intermediate scrutiny *only* when the

government avoids a total ban on protected expression, and when its predominant interest, supported by an evidentiary record, is in the amelioration of secondary effects. 475 U.S. at 54, 106 S.Ct. 925.

The county's bid for intermediate scrutiny fails to clear the first hurdle, because section 13(e) effects a *total* ban on a particular kind of erotic expression at *all times* and in *every part* of the county. The argument that section 13(e) is really just a plain old time, place and manner restriction because it prohibits only certain expressive activity in certain *types* of establishments but not elsewhere does not work because, for reasons explained earlier, the only way an establishment fits within the ordinance in the first place is if it engages in that which the ordinance prohibits.

The prohibition Maricopa County has put in place is quite different from any of the regulations the Supreme Court has considered in the *Renton* line. The *Renton* ordinance itself was a classic content-discriminatory time, place, and manner regulation. While it targeted adult entertainment on the basis of its content, the ordinance did "not ban adult theaters altogether." 475 U.S. at 46, 106 S.Ct. 925. Instead, it imposed restrictions on where such establishments could operate in order to protect residential neighborhoods. *Id.* Consequently, it was subject to intermediate instead of strict scrutiny. *Id.* The same is true of the *Young* ordinance, which imposed geographic zoning restrictions on adult entertainment. 427 U.S. at 62, 96 S.Ct. 2440. So long as an establishment complied with the regulation, it was free to provide adult entertainment "essentially unrestrained." *Id.* The Court specifically noted in that case that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly . restricting access to, lawful speech." *Id.* at 71 n. 35, 96 S.Ct. 2440; *see also Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 71, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("The Court [in *Young* ] did not imply that a municipality could ban all adult theaters—much less all live entertainment or all nude dancing—from its commercial districts citywide.").

Other cases in the *Renton* line have drawn intermediate scrutiny because, even though they incidentally burdened expression, they were facially content-neutral laws of general applicability. In *Barnes,* the Court dealt with a state statute prohibiting nudity in public places "across the board" in a facially content-neutral manner. 501 U.S. at 566, 111 S.Ct. 2456. The statute on its face was "not at all inherently related to expression," *id.* at 585, 111 S.Ct. 2456 (Souter, J., concurring), and was therefore subject to intermediate scrutiny. The city ordinance in *Erie* was also a content-neutral proscription of public nudity. In upholding the ordinance, the Court explained that "[b]eing 'in a state of nudity' is not an inherently expressive condition. . . . By its terms, the ordinance regulates conduct alone. *It does not target nudity that contains an erotic message;* rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity." 529 U.S. at 289–90, 120 S.Ct. 1382 (emphasis added). The prohibition at issue in this case is of a different order. It is not a content-discriminatory time, place and manner regulation, so it is not like the ordinances at issue in *Renton* and *Young.* Nor is it a facially-neutral law of general applicability, so it is not like the ordinances in *Barnes* and *Erie.* Section 13(e) "does not . . . simply ban or restrict certain conduct, irrespective of any message that the conduct may be intended to convey; instead, by its own terms the Ordinance is directed to activity that conveys eroticism or sexuality." *Brownell,* 190 F.Supp.2d at 489.

The Seventh Circuit considered the same prohibition on "specific sexual activity" in *Schultz*, 228 F.3d at 846–48, and struck it down as an unconstitutional infringement on protected expression.

> By restricting the particular movements and gestures of the erotic dancer … the Ordinance unconstitutionally burdens the protected expression. The dominant theme of nude dance is an emotional one; it is one of eroticism and sensuality. [The Ordinance] deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate her erotic message. It interdicts the two key tools of expression in this context that imbue erotic dance with its sexual and erotic character—sexually explicit dance movements and nudity. …

*Id.* at 847 (internal citations and quotation marks omitted).

The Seventh Circuit further explained that the government could not hide behind *Renton* because "a secondary-effects rationale by itself does not bestow upon the government free license to suppress specific content of a specific message …." *Id.* at 845. "[S]uch a regime would permit the government to single out a message expressly, formulate a regulation that prohibits it, then draw content-neutral treatment nonetheless simply by producing a secondary effects rationale as pretextual justification." *Id.* at 844; *see also Brownell*, 190 F.Supp.2d at 484–93 (following *Schultz* and striking prohibition on "specified sexual activities").

We are inclined to agree with the Seventh Circuit. Maricopa County cannot avoid the constitutional prohibition on proscribing non-obscene speech "by regulating nude dancing with such stringent restrictions that the dance no longer conveys eroticism nor resembles adult entertainment." *Schultz*, 228 F.3d at 844. Section 13(e), in preventing erotic dancers from practicing a protected form of expression, does precisely that.

We therefore apply strict scrutiny to section 13(e). To survive strict scrutiny, the provision must be tailored to "serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster, Inc. v. New York Crime Victims Bd.*, 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). Section 13(e) is not necessary to serve Maricopa County's unquestioned significant interest in ameliorating secondary effects. The county can, and does, utilize a variety of less restrictive and more direct means to fight those effects. Nor has the county explained how the restriction will in fact further its interest in curbing secondary effects. Therefore, we must conclude that section 13(e) is an unconstitutional burden on the enjoyment of protected expression.

Our decision today does not necessarily imply that none of the activities listed in section 13(e) may be proscribed, consistent with the Constitution, through a well-crafted ordinance. *Cf. Brownell*, 190 F.Supp.2d at 492. Section 13(e) is far too broad, however, and restricts in sweeping terms the ability of erotic dancers to convey their intended erotic message. In defining establishments by reference to that which it prohibits, it amounts to an absolute ban on such activity in Maricopa County. For these reasons, section 13(e) is unconstitutional.

## X

█ In addition to the various First Amendment challenges to Ordinance P–10, Dream Palace sought invalidation of certain of its provisions on state law grounds. Specifically, Dream Palace sought summary judgment with respect to certain operating restrictions on the basis

that state law has preempted county law; it also sought invalidation of certain penalty provisions as ultra vires. The district court declined to reach these issues, and dismissed the claims, explaining that "the remaining state-law claims raise delicate issues involving the interpretation and application of Arizona law and the balance of powers within Arizona between state and local government." We review that decision for an abuse of discretion. *See Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1165 (9th Cir.2002).

28 U.S.C. § 1367 affords district courts the discretion to decline to exercise jurisdiction over supplemental state law claims if, among other reasons, "the claim raises a novel or complex issue of State law," or "the district court has dismissed all claims over which it had original jurisdiction." Such is the case here: the district court had decided each and every claim over which it had original jurisdiction, and the remaining state law claims, concerning as they do issues of the balance of power between state and local authorities in Arizona, involved delicate issues of state law. While the district court had the *discretion* to reach and to decide these state law issues, we cannot say that its refusal to do so constituted an abuse of discretion. *See* 28 U.S.C. § 1367.

### XI

■■■ Finally, because we have declared Ordinance P–10 constitutionally invalid for some purposes but not for others, we must determine whether the valid portions can be severed from the invalid ones. "An entire statute need not be declared unconstitutional if constitutional portions can be severed." *Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 151, 800 P.2d 1251 (1990). Under Arizona law, the test for severability requires ascertaining legislative intent. *Id.* "[T]he most reliable evidence of that intent is the language of the statute." *State v. Prentiss*, 163 Ariz.

81, 86, 786 P.2d 932 (1989). The Arizona Supreme Court has held that where "the valid parts of a statute are effective and enforceable standing alone and independent of those portions declared unconstitutional," a court should not disturb the valid part "if the valid and invalid portions are not so intimately connected as to raise the presumption the legislature would not have enacted one without the other, and the invalid portion was not the inducement of the act." *Selective Life Ins. Co. v. Equitable Life Assurance Soc'y*, 101 Ariz. 594, 599, 422 P.2d 710 (1967).

■■■ Ordinance P–10 contains a robust severability clause: "Each section and each provision or requirement of any section of this ordinance shall be deemed severable and the invalidity of any portion of this ordinance shall not affect the validity or enforceability of any other portion." Ordinance § 25. Given that the county board has clearly expressed its intent with respect to severability, we think the invalid portions of the ordinance are easily severable. We hold unconstitutional the prohibition on specified sexual activity, and have instructed the district court to enjoin the disclosure to the public of information provided by permit applicants. The vast majority of the provisions in the ordinance, including the licensing scheme, and multiple operating restrictions, withstand scrutiny. The invalid portions are, therefore, severable from the remainder, and the remaining valid portions may remain in force.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** with instructions. Each party shall bear its own costs.

CANBY, Circuit Judge, concurring:

I concur in Judge O'Scannlain's well-written opinion. Were I writing on a blank slate, however, I would dissent from Section VI, which upholds the prohibition

against operation of adult-oriented businesses between the hours of 1:00 a.m. and 8:00 a.m. on Monday through Saturday, and 1:00 a.m. and 12:00 noon on Sunday. As Judge O'Scannlain's opinion recognizes, the result reached in Section VI is largely controlled by *Fair Public Policy v. Maricopa County*, 336 F.3d 1153 (9th Cir.2003). I dissented in that case because I was convinced, as I still am, that the hours restriction violated the holding of a majority of the Supreme Court (per Justice Kennedy) in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). The record in the present case is not sufficiently different from that in *Fair Public Policy* to lead me to a different conclusion. I recognize, however, that my view did not prevail in *Fair Public Policy*, and I am bound by that decision. I therefore concur fully in Judge O'Scannlain's opinion today.

## APPENDIX

**ORDINANCE NO. P–10**

**ADOPTED April 23, 1997**

**AMENDED July 23, 1997**

**AMENDED July 17, 1998**

**ADOPTED as AMENDED September 2, 1998**

**MARICOPA COUNTY ORDINANCE NO. 10 ADULT ORIENTED BUSINESSES AND ADULT SERVICE PROVIDERS**

*SECTION 1. FINDINGS*

Based on public testimony and other evidence before it, including information, studies and court decisions from other jurisdictions, and in accordance with A.R.S. 11–821, the Maricopa County Board of Supervisors makes the following legislative findings and statement of purpose:

The Board of Supervisors recognizes that some activities which occur in connection with adult oriented businesses are protected as expression under the First Amendment to the United States Constitution. The Board of Supervisors further recognizes that First Amendment rights are among our most precious and highly protected rights, and wishes to act consistently with full protection of those rights. The Board is aware, however, that adult oriented businesses may and do generate secondary effects which are detrimental to the public health, safety and welfare. Among those secondary effects are (a) prostitution and other sex related offenses (b) drug use and dealing (c) health risks through the spread of AIDS and other sexually transmitted diseases and (d) infiltration by organized crime for the purpose of drug and sex related business activities, laundering of money and other illicit conduct. This ordinance is not intended to interfere with legitimate expression but to avoid and mitigate the secondary effects enumerated above. Specifically, the Board of Supervisors finds the licensing of persons who operate and manage adult oriented businesses and persons who provide adult services will further the goals of the ordinance by enabling the County to ascertain if an applicant is underage or has engaged in criminal or other behavior of the sort the ordinance is designed to limit. This information will enable the County to allocate law enforcement resources effectively and otherwise protect the community. The Board of Supervisors finds that limiting proximity and contact between adult service providers and patrons promotes the goal of reducing prostitution and other casual sexual conduct and the attendant risk of sexually transmitted diseases. The Board of Supervisors finds the foregoing to be true with respect to places where alcohol is served and where it is not. The Board of Supervisors finds that individual and interactive sexual activities in adult video facilities pose a risk of sexually transmitted disease, especially AIDS, and

that the booth configuration options of the ordinance will reduce that risk. The Board of Supervisors finds that the harmful secondary effects of adult oriented businesses are more pronounced when conducted continuously or during late night hours. The fees established for licenses and permits in this ordinance are based on the estimated cost of implementation, administration and enforcement of the licensing program.

## SECTION 2. DEFINITIONS

The following words, terms and phrases when used in this ordinance shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

**Adult Arcade** means any place to which the public is permitted or invited and in which coin-operated or slug-operated or electronically, electrically or mechanically controlled still or motion picture machines, projectors or other image-producing devices are maintained to show images involving specific sexual activities or specific anatomical areas to persons in booths or viewing rooms.

**Adult Bookstore** or **Adult Video Store** means a commercial establishment that offers for sale or rent any of the following as one of its principal business purposes:

 (1) Books, magazines, periodicals or other printed matter, photographs, films, motion pictures, video cassettes or video reproductions or slides or other visual representations that depict or describe specific sexual activities or specific anatomical areas; or

 (2) Instruments, devices or paraphernalia that are designed for use in connection with specific sexual activities.

**Adult Live Entertainment Establishment** means an establishment that features either:

 (1) Persons who appear in a state of nudity; or

 (2) Live performances that are characterized by the exposure of specific anatomical areas or specific sexual activities.

**Adult Motion Picture Theater** means a commercial establishment in which for any form of consideration films, motion pictures, video cassettes, slides or other similar photographic reproductions that are characterized by the depiction or description of specific sexual activities or specific anatomical areas are predominantly shown.

**Adult oriented business** means adult arcades, adult bookstores or adult video stores, cabarets, adult live entertainment establishments, adult motion picture theaters, adult theaters, massage establishments that offer adult service or nude model studios.

**Adult oriented business manager** or **"manager"** means a person on the premises of an adult oriented business who is authorized to exercise overall operational control of the business.

**Adult service** means dancing, serving food or beverages, modeling, posing, wrestling, singing, reading, talking, listening or other performances or activities conducted for any consideration in an adult oriented business by a person who is nude or semi-nude during all or part of the time that the person is providing the service.

**Adult service business** means a business establishment or premises where any adult service is provided to patrons in the regular course of business.

**Adult service provider** or **"provider"** means any person who provides an adult service.

**Adult theater** means a theater, concert hall, auditorium or similar commercial establishment that predominantly features

persons who appear in a state of nudity or who engage in live performances that are characterized by the exposure of specific anatomical areas or specific sexual activities.

**Booth** means a partitioned area, in which coin or token operated video machines, projectors or other electronically or mechanically controlled devices are used in the regular course of business to produce still or moving picture images characterized by depiction of specific sexual activities or specific anatomical areas.

**Cabaret** means an adult oriented business licensed to provide alcoholic beverages pursuant to A.R.S. Title 4, Chapter 2, Article 1.

**County Sheriff** means the elected County Sheriff or the Sheriff's designee.

**Director** means the director of Maricopa County Planning and Development Department or the Director's designee.

**Employee** means any person hired, engaged or authorized to perform any service on the premises of an adult service business, including an adult service provider, whether denominated as an employee, independent contractor or otherwise.

**Enterprise** means a corporation, association, labor union or other legal entity, as provided in A.R.S. 13–105.

**License** means the license required by this ordinance as a condition to conducting an adult oriented business.

**Licensee** means a person or enterprise holding an adult oriented business license issued under this ordinance, including those persons required to provide information under section 6 of this ordinance.

**Manager's station** means a permanently designated area marked accordingly within an adult oriented business where an adult oriented business manager is located in the normal course of operations.

**Massage Establishment** means an establishment in which A person, firm, association or corporation engages in or permits massage activities, including any method of pressure on, friction against, stroking, kneading, rubbing, tapping, pounding, vibrating or stimulating of external soft parts of the body with the hands or with the aid of any mechanical apparatus or electrical apparatus or appliance. This definition shall not apply to:

(1) Physicians licensed pursuant to A.R.S. Title 32, Chapter 7, 8, 13, 14 or 17;

(2) Registered nurses, licensed practical nurses or technicians who are acting under the supervision of a physician licensed pursuant to A.R.S. Title 32, Chapter 13 or 17;

(3) Persons employed or acting as trainers for any bona fide amateur, semi-professional or professional athlete or athletic team;

(4) Persons who are licensed pursuant to A.R.S. TITLE 32, Chapter 3 or 5, if the activity is limited to the head, face or neck.

**Nude Model Studio** means a place in which a person who appears in a state of nudity or who displays specific anatomical areas is observed, sketched, drawn, painted, sculptured, photographed or otherwise depicted by other persons who pay money or other consideration. Nude model studio does not include a proprietary school that is licensed by the State of Arizona or a college, community college or university that is supported entirely or in part by taxation, a private college or university that maintains or operates educational programs in which credits are transferable to a college, community college or university supported entirely or partly by taxation, or a structure to which the following apply:

(1) A sign is not visible from the exterior of the structure and no other advertising appears indicating that a nude person is available for viewing; and

(2) A student must enroll at least three days in advance of the class in order to participate; and

(3) No more than one nude or seminude model is on the premises at any time.

**Nude, Nudity** or **state of nudity** means any of the following:

a) The appearance of a human anus, or female breast below a point immediately above the top of the areola.

b) A state of dress which fails to opaquely cover a human anus, genitals or female breast below a point immediately above the top of the areola.

**Patron** means a person invited or permitted to enter and remain upon the premises of an adult oriented business, whether or not for consideration.

**Permit** means the permit required by this ordinance to engage in the activities of an adult service provider or an adult oriented business manager.

**Principal business purposes** means that a commercial establishment derives fifty percent or more of its gross income from the sale or rental of items listed in subparagraphs (1) and (2) of the definitions in this section of adult bookstore or adult video store.

**Seminude** means a state of dress in which clothing covers no more than the genitals, pubic region and female breast below a point immediately above the top of the areola, as well as portions of the body that are covered by supporting straps or devices.

**Specific anatomical areas** means any of the following:

a) A human anus, genitals, pubic region or a female breast below a point immediately above the top of the areola that is less than completely and opaquely covered.

b) Male genitals in a discernible turgid state even if completely and opaquely covered.

**Specific sexual activities** means any of the following:

a) Human genitals in a state of sexual stimulation or arousal.

b) Sex acts, normal or perverted, actual or simulated, including acts of human masturbation, sexual intercourse, oral copulation or sodomy.

c) Fondling or other erotic touching of the human genitals, pubic region, buttocks, anus or female breast.

d) Excretory functions as part of or in connection with any of the activities under subdivision a), b) or c) of this definition of specific sexual activities.

## SECTION 3. PURPOSE

The principal purpose of this ordinance is to establish licensing procedures and regulations for adult oriented businesses and facilities, and their employees, within the unincorporated areas of Maricopa County. The procedures and regulations contained herein are designed to accommodate these types of businesses and facilities while still recognizing the need to promote the public health, safety and general welfare of the citizens of Maricopa County.

## SECTION 4. ADMINISTRATION

a) The administration of this ordinance, including the duty of prescribing forms, is vested in the Director, except as otherwise specifically provided. The County Sheriff shall render such assistance in the administration and enforcement of this ordinance as may be requested by the Director.

b) License or permit applications made pursuant to this ordinance shall be submitted to the Director who shall grant, deny, suspend or revoke licenses or permits in accordance with the provisions of this ordinance.

c) Licenses issued pursuant to this ordinance shall be valid for a period of one year from date of issuance.

d) Permits issued pursuant to this ordinance shall be valid for a period of three years from the date of issuance.

## SECTION 5. ADULT ORIENTED FACILITIES BUSINESS LICENSE REQUIRED

a) A person or enterprise may not conduct an adult oriented business without first obtaining an adult oriented business license pursuant to this ordinance. The license shall state the name of the license holder, the name, address and phone number of the licensed premises, and the dates of issuance and expiration of the license.

b) An adult oriented business for which a license has been issued pursuant to this ordinance may conduct business only under the name or designation specified in the license.

c) A licensee shall conduct business only at the address shown on the license. Each additional place of business shall require a separate license.

d) An adult oriented business license shall be displayed on the premises in such a manner as to be readily visible to patrons.

## SECTION 6. APPLICATION FOR ADULT ORIENTED BUSINESS LICENSE

a) An applicant for an adult oriented business license shall file at the office of the Director an application, signed under oath by the applicant and notarized, accompanied by the fee required under section 21. An applicant or other person whose fingerprints and photograph are required under paragraph C may, at his option, be photographed and fingerprinted at the office of the Sheriff or other law enforcement agency. An application shall be deemed complete when the Director has received the required fees, all information required in paragraph C, fingerprints of the applicant and a photograph of the applicant's face, and, in the case of a corporation or other business organization, A photograph and fingerprints of all persons for whom information is required under paragraph C of this section. The purpose for obtaining these fingerprints and photographs is to obtain a state and federal records check. The Sheriff's Office and the Department of Public Safety are authorized to exchange this information with the Federal Bureau of Investigation.

b) Fingerprints and photograph, if not taken at the office of the Sheriff, shall be taken by a law enforcement agency and accompanied by a notarized verification by that agency. If the applicant requests that fingerprints and photograph be taken by the office of the sheriff, such fingerprints and photograph shall be completed by the office of the sheriff within ten working days of the request. Any such fingerprints or photograph not completed by the office of the sheriff within ten working days of the request shall be deemed to have been completed and received by the director for purposes of the application.

c) The application shall include the information called for in subparagraphs 1 through 10. If the applicant is an enterprise, it shall designate an officer

or partner as applicant. In such case, in addition to the information required in subparagraphs 1 through 10 for the applicant, the application shall include the State and date of formation of the organization and the information called for in subparagraphs 2 through 7 of this section with respect to each officer, director, general partner, and all other persons with authority to participate directly and regularly in management of the business, provided that, such information need not be provided with respect to attorneys, accountants and other persons whose primary function is to provide professional advice and assistance to the licensee.

1) The name, business location, business mailing address and phone number of the proposed adult oriented business establishment.

2) The applicant's full true name and other names, aliases or stage names used in the preceding five years.

3) The applicant's current residential mailing address and telephone number.

4) Written proof of age of the applicant, in the form of a birth certificate, current driver's license with picture, or other picture identification document issued by a governmental agency.

5) The issuing jurisdiction and the effective dates of any license or permit relating to an adult oriented business or adult service, whether any such license or permit has been revoked or suspended within the past two years, and, if so, the reason or reasons therefor.

6) All criminal charges, complaints or indictments in the preceding three years which resulted in a conviction or a plea of guilty or no contest for an "organized crime and fraud" offense under A.R.S. title 13, chapter 23, a "prostitution" offense under A.R.S. title 13, chapter 32, a "drug offense" under A.R.S. title 13, chapter 34, or a "sexual offense" under A.R.S. title 13, sections 1401 through 1406 or under section 1412, or for conduct in another jurisdiction which if carried out in Arizona would constitute an offense under one of the statutory provisions enumerated in this subparagraph.

7) The applicant's fingerprints and a photograph of the applicant's face.

8) The name and address of the statutory agent or other agent authorized to receive service of process.

9) The names of the adult oriented business manager(s) who will have actual supervisory authority over the operations of the business.

10) An accurate, to scale, but not necessarily professionally drawn, site plan and floor plan of the business premises and, in an application for an adult service business license, also clearly indicating the location of one or more manager's stations.

d) The information provided pursuant to subparagraphs 5 and 6 of paragraph C of this section shall be supplemented in writing by certified mail to the Director within ten working days of a change of circumstances which would render the information originally submitted false or incomplete.

e) As requested by the director, the Sheriff shall investigate and confirm information supplied by the applicant.

## SECTION 7. ADULT ORIENTED BUSINESS MANAGER PERMIT

a) A person may not serve as an adult oriented business manager unless the person has first secured an adult ori-

ented business manager permit under this section.

b) Application for an adult oriented business manager permit shall be made in the same manner as application for an adult business license, except that the applicant need provide only the information called for in subparagraphs 2 through 7 of section 6(c).

c) The purpose for obtaining the applicant's fingerprints and a photograph of the applicant's face is to obtain a state and federal records check. The sheriff's office and the department of public safety are authorized to exchange this information with the federal bureau of investigation.

## SECTION 8. ADULT SERVICE PROVIDER PERMIT

a) A person may not work as an adult service provider unless the person has first obtained an adult service provider permit under this section.

b) Application for an adult service provider permit shall be made in the same manner as an application for an adult oriented business license, except that the applicant need provide only the information called for in subparagraphs 2 through 7 of section 6(c).

c) The purpose for obtaining the applicant's fingerprints and a photograph of the applicant's face is to obtain a state and federal records check. The sheriff's office and the department of public safety are authorized to exchange this information with the federal bureau of investigation.

## SECTION 9. CONFIDENTIALITY

The information provided by an applicant in connection with the application for a license or permit under this ordinance shall be maintained in confidence by the Director, subject only to the public record laws of the State of Arizona.

## SECTION 10. GRANT OR DENIAL OF LICENSE OR PERMIT.

a) Within forty five days after receipt of a complete application for an adult oriented business license, the Director shall mail to the applicant a license or a notice of intent to deny. If the Director fails to do so, the license shall be deemed granted.

b) Upon receipt of an application for an adult oriented business manager permit or an adult service provider permit, including all information required by sections 7(b) and 8(b), payment of the required fees and completion of photograph and fingerprinting requirements of section 6, the Director shall issue to the applicant a temporary permit. Within thirty days after issuance of a temporary permit, the Director shall mail to the applicant a regular permit or a notice of intent to deny. If the Director fails to do so, the permit shall be deemed granted.

c) The issuance of any license, permit or temporary permit does not waive any right of County to revoke, deny or suspend for any defect, omission or misrepresentation in the application.

d) The Director shall grant the license or permanent permit to an applicant who has completed all requirements for application, unless the Director finds any of the following conditions noted below. For purposes of this paragraph, a person required to submit information pursuant to section 6(c) shall be deemed an applicant.

1) The application is incomplete or contains a misrepresentation, false statement or omission.

2) The applicant has failed to comply with applicable zoning or other land

use ordinances of the County relating to the business or activity to be carried out under the license or permit.

3) The applicant is delinquent in payment of any county taxes, fees or other payments due in connection with the business or activity to be carried out under the license or permit.

4) The applicant is not at least eighteen years of age.

5) The applicant, or other person required to provide information under section 6(c), in the past three years has been convicted, or plead guilty or no contest with respect to a felony violation or two misdemeanor violations of one or more offenses in the categories stated in section 6(c).

6) Within the past two years, a license or permit under this article held by an applicant, or other person required to provide information pursuant to section 6(c), has been revoked, or a similar license in another jurisdiction has been revoked on the basis of conduct which would be a ground for revocation of a license or permit issued under this section if committed in the county.

## SECTION 11. NON–TRANSFERABILITY

Licenses and permits issued under this article are nontransferable.

## SECTION 12. ADULT SERVICE PROVIDER OR MANAGER WORK IDENTIFICATION CARD

The Director shall provide a work identification card to all adult service providers and adult oriented business managers. The card shall contain a photograph of the permittee, the number of the permit issued to that permittee and the date of expiration of the permit.

## SECTION 13. ADULT SERVICE BUSINESS; OPERATING REQUIREMENTS

a) A person employed or acting as an adult service provider or manager shall have a valid permit issued pursuant to the provisions of this ordinance. A permit or a certified copy thereof for each manager or provider shall be maintained on the premises in the custody of the manager at all times during which a person is serving as a provider or manager on the premises. Such permits shall be produced by the manager for inspection upon request by a law enforcement officer or other authorized county official.

b) An adult service business shall maintain a daily log of all persons providing adult services on the premises. The log shall cover the preceding twelve month period and shall be available for inspection upon request by a law enforcement officer or other authorized county official during regular business hours.

c) A person below the age of eighteen years may not observe or provide an adult service.

d) A person may not provide an adult service in an adult service business except upon a stage elevated at least eighteen inches above floor level. All parts of the stage, or a clearly designated area thereof within which the adult service is provided, shall be a distance of at least three feet from all parts of a clearly designated area in which patrons may be present. The stage or designated area thereof shall be separated from the area in which patrons may be located by a barrier or railing the top of which is at least three feet above floor level. A provid-

er or patron may not extend any part of his or her body over or beyond the barrier or railing.

e) An adult service provider, in the course of providing an adult service, may not perform a specific sexual activity.

f) Adult services may not be provided between the hours of 1:00 a.m. and 8:00 a.m. on Monday through Saturday or between the hours of 1:00 a.m. and 12:00 noon on Sunday.

g) An adult service may not be provided in any location which is not visible by direct line of sight at all times from a manager's station located in a portion of the premises which is accessible to patrons of the adult service business.

h) An adult service provider shall wear his or her adult service provider work identification card at all times while on the premises except while providing an adult service. The card shall be affixed to clothing on the front of the person and above waist level so that the picture and permit number are clearly visible to patrons.

i) An adult oriented business manager shall be on the premises of an adult service business at all times during which any adult service is provided on the premises. The manager shall wear his or her identification card in the manner described in paragraph h above.

j) An employee may not knowingly or intentionally touch the breast, buttocks or genitals of a patron, nor may a patron knowingly or intentionally touch the breast, buttocks or genitals of an employee.

k) A sign, in a form to be prescribed by the Director summarizing the provisions of subparagraphs c, d, j, and l of this section, shall be posted near the entrance of an adult service business

in such a manner as to be clearly visible to patrons upon entry.

l) A patron may not place any money on the person or in or on the costume of an adult service provider while the adult service provider is nude or semi-nude.

m) A manager or licensee may not knowingly permit or tolerate a violation of any provision of this section.

n) With respect to a cabaret, the requirements of this section shall apply to the extent that they are not in conflict with specific statutory or valid regulatory requirements applicable to persons licensed to dispense alcoholic beverages.

## SECTION 14. ADULT ARCADES; OPERATING REQUIREMENTS

a) An adult arcade shall be equipped with overhead lighting fixtures of sufficient intensity to illuminate every place to which patrons are permitted access at an illumination of not less than one footcandle, as measured at the floor level.

b) Each booth or viewing room shall either: (a) be configured in such a way that allows persons patrolling the area outside the booth or viewing room to observe from outside the booth or viewing room the activities of any occupant in the interior of the booth or viewing room, or (b) if not so configured, be equipped with a mirror or other device which allows persons patrolling the area outside the booth or viewing room to observe from outside the booth or viewing room the activities of any occupant in the interior of the booth or viewing room.

c) An adult oriented business manager shall be on the premises of an adult arcade at all times that the arcade is open for business. The manager shall

wear his or her identification card in the manner described in section 13(h) above.

d) A patron may not engage in specific sexual activities on the premises of an adult arcade.

e) A booth or viewing room shall not have any hole or aperture in any wall separating that booth or viewing room from another.

f) A manager or licensee may not knowingly permit or tolerate a violation of any provision of this section.

## SECTION 15. INSPECTION OF PREMISES AND RECORDS

The manager shall permit law enforcement officers or other authorized county officials to inspect the premises upon request during regular business hours.

## SECTION 16. SUSPENSION OF LICENSE OR PERMIT

The Director shall suspend a license or permit for a period of ten days if the licensee or permittee is convicted of violating a provision of this ordinance.

## SECTION 17. REVOCATION OF LICENSE OR PERMIT

The Director shall revoke a license or permit issued pursuant to this ordinance if the licensee or permittee:

a) Is convicted of three or more violations of this ordinance in any twelve month period.

b) Is convicted or pleads guilty or no contest to an offense stated in section 6(c).

c) Is determined to have filed inaccurate information required under section 10(d) of this ordinance.

## SECTION 18. PROCEDURES FOR DENIAL, REVOCATION, NONRENEWAL OR SUSPENSION; APPEAL

If the Director determines that grounds exist for denial, suspension or revocation of a license or permit under this ordinance, he/she shall notify the applicant, licensee or permittee (respondent) in writing of his/her intent to deny, suspend or revoke, including a summary of the grounds therefor. The notification shall be by certified mail to the address on file with the Director. Within ten working days of receipt of such notice, the respondent may provide to the Director in writing a response which shall include a statement of reasons why the license or permit should not be denied, suspended or revoked and may include a request for a hearing. If a response is not received by the Director in the time stated, the notification shall be the final administrative action of denial, suspension or revocation and notice of such will be sent to the permittee or licensee within five working days after the expiration of the period for submitting a response. Within five working days after receipt of a response, the Director shall either withdraw the intent to deny, suspend or revoke, and send notification of the withdrawal to the respondent in writing by certified mail, or shall schedule a hearing before a hearing officer and send notification to the respondent in writing by certified mail of the date, time and place of the hearing. If the Director fails to send a timely notification either withdrawing the intent or scheduling a hearing, the intent to deny, suspend or revoke shall be deemed withdrawn. The hearing, if requested, shall be scheduled not less than fifteen nor more than thirty working days after receipt by the Director of the request for a hearing. The hearing shall be conducted in an informal manner. The respondent may be represented by counsel. If respondent is repre-

sented by counsel, attorneys' fees shall be at the expense of respondent. The rules of evidence shall not apply. Respondent shall have the burden of proving by a preponderance of the evidence that the denial, suspension or revocation was arbitrary or capricious and an abuse of discretion. The hearing officer shall render a written decision within five working days after completion of the hearing and shall mail a copy of the decision by certified mail to the address of the respondent on file with the Director. If more than forty five days elapse between receipt by the Director of a request for a hearing and mailing by the hearing officer of a final decision to the respondent, a decision in favor of the applicant, licensee or permittee shall be deemed to have been rendered. In the case of an intent to revoke, suspend or non-renew a license or permit, or to deny a regular permit, the permittee or licensee may continue to function under the license or permit pending receipt of the final decision of the hearing officer. The decision shall be final at the end of five working days after it is mailed and shall constitute final administrative action.

### SECTION 19. JUDICIAL APPEAL

Final administrative action to deny, revoke or non-renew a license or permit may be appealed to the Superior Court by special action or other available procedure within thirty five days after receipt of written notice of the decision. The County shall consent to expedited hearing and disposition. If a permittee or licensee pursues a judicial appeal from a final administrative action, that permittee or licensee may continue to function under the license or permit pending completion of judicial review.

### SECTION 20. LICENSE AND PERMIT RENEWAL

a) A license or permit may be renewed by filing an application for renewal in writing with the Director. The application shall contain the information required to be submitted with an original application, including fingerprints and a photograph, provided that, a renewal application need not contain any other information that has been provided in a previous application and has not changed since the time of the most recent application. An application for license renewal shall be received by the Director not less than forty five days before the expiration of the license. An application for permit renewal shall be received by the Director before expiration of the permit.

b) The Director may deny an application for renewal for the reasons and in accordance with the procedures set forth in Section 10.

### SECTION 21. FEES

a) An original application for an adult oriented business license shall be accompanied by a non-refundable application fee in the amount of five hundred dollars ($500) and by a license fee in the amount of five hundred dollars ($500). The license fee will be refunded if the license is denied. An application for renewal shall be accompanied by the amount of the license fee.

b) An application for issuance or renewal of an adult service provider permit shall be accompanied by a non-refundable fee of one hundred dollars ($100).

c) An application for issuance or renewal of an adult oriented business manager permit shall be accompanied by a non-refundable fee of one hundred and fifty dollars ($150).

d) A duplicate or certified copy of a license, permit or identification card shall be issued by the Director upon payment of a fee of ten dollars ($10).

e) An applicant also shall be required to pay, to the law enforcement agency which provides the applicant with fingerprinting or photography services, the standard fee, if any, charged by that agency for each set of fingerprints and the photograph required to be provided under section 6.

### SECTION 22. OTHER REGULATIONS

A license or permit required by this ordinance is in addition to any other licenses or permits required by the County or the State to engage in the business or occupation. Persons engaging in activities described in this ordinance shall comply with all other ordinances and laws, including the County Zoning Ordinance, as may be required, to engage in a business or profession.

### SECTION 23. PENALTY

a) Violation of any requirement or prohibition stated in this ordinance is a Class 2 Misdemeanor, punishable upon conviction by a fine of not more than seven hundred and fifty dollars ($750) or by imprisonment for not more than four months. With respect to a violation that is continuous in nature, each day that the violation continues shall constitute a separate offense.

b) In addition to other penalties, an adult oriented business which operates without a valid license shall constitute a public nuisance which may be abated in a manner provided by law.

### SECTION 24. APPLICABILITY

This ordinance shall apply to all persons engaging in the activities described herein, whether or not such activities were commenced prior to the effective date of this ordinance. Persons so engaged as of the effective date of this ordinance shall be in full compliance with this ordinance, including receipt of any required license or permit, within one hundred eighty days after the effective date of this ordinance.

### SECTION 25. SEVERABILITY

Each section and each provision or requirement of any section of this ordinance shall be deemed severable and the invalidity of any portion of this ordinance shall not affect the validity or enforceability of any other portion.

**ADOPTED April 23, 1997**

**AMENDED July 12, 1997**

**AMENDED July 17, 1998**

**ADOPTED as Amended this 2nd day of September, 1998.**